Michele Besso
Northwest Justice Project
501 Larson Bldg., 6 South 2nd Street
Yakima, WA  98901
(509) 574-4234

Weeun Wang
Farmworker Justice
1126 16th Street NW, Suite 270
Washington, DC 20036

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

ELVIS RUIZ, et al.,

               Plaintiffs,

    v.

MAX FERNANDEZ, et al.,

               Defendants.

No. CV-11-3088-RMP

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY
JUDGMENT

## I.  INTRODUCTION

Plaintiffs came to the United States from Chile to work on a ranch operated by defendant Max Fernandez.  Defendant Western Range Association ("WRA"), a membership association comprised of sheep ranchers, recruited, hired, and brought plaintiffs to work in the United States as range sheepherders under the federal temporary agricultural guest worker visa program, commonly known as the "H-2A

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 1

Northwest Justice Project
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

program."[1]  The plaintiffs performed little or no range sheepherding work during

their employment at Fernandez Ranch.  Instead, they were put to work as general

ranch hands, for which they were entitled to substantially higher wages than the

$750 per month that they were paid as H-2A sheepherders.  As a result, the

plaintiffs brought this action against defendants, alleging violations of the Fair

Labor Standards Act ("FLSA"), the Trafficking Victims Protection

Reauthorization Act, the Washington Wage Payment Act, and breach of contract.

Plaintiffs now move this Court for summary judgment that (1) WRA

employed the plaintiffs under the FLSA; (2) the work performed by the plaintiffs

when jointly employed by defendants was not "range production of livestock" and

thus not exempted from the minimum wage provisions of the FLSA; (3)

defendants breached their employment contract with the plaintiffs; and (4)

plaintiffs were engaged in commerce for purposes of the FLSA.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is

[1] *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a) and U.S. Department of Labor regulations promulgated thereunder, 20 C.F.R. part 655 (1987, amended 2009, 2010) (as the cited provisions of the H-2A regulations are substantially the same for purposes of this Motion for Partial Summary Judgment, all such citations are to the 1987 regulations).

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 2

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is not

2    "genuine," and summary judgment will be warranted, if no reasonable jury

3    viewing the evidence could return a verdict for the nonmoving party.  *Anderson v.*

4    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.    WRA EMPLOYED THE PLAINTIFFS

6           WRA and its member sheep ranchers are "joint employers" of the plaintiffs

7    under the H-2A program.  As such, WRA and its members are jointly responsible

8    for complying with the labor standards and worker protections imposed by federal

9    regulations governing the H-2A program, as discussed below, including the

10   minimum wage provisions of the FLSA.  In addition, WRA's control over the H-

11   2A employment relationship with its members and sheepherders independently

12   confirms WRA's status as a joint employer under the FLSA.

### A.    WRA's Obligations to Plaintiffs as an H-2A Employer

           WRA admits that it acted as an employer of the plaintiffs for purposes of the

H-2A program.[2]  WRA Answer to Complaint, ¶11 (ECF No. 63).  WRA applied to

the U.S. Department of Labor ("DOL") for authorization to employ plaintiffs and

---

[2] There is no difference in the regulatory scope of responsibility or liability to workers as between an "employer" and a "joint employer" under the H-2A program.  *See* 20 C.F.R. § 655.100(b) (definition of "employer" includes an association of employers that may either be the sole employer of its members' workers or a joint employer along with its members).  Thus, in *Salazar-Calderon*

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 3

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1  other H-2A workers in the capacity of "joint employer" in association with its

2  member sheep ranchers.  Plaintiffs' Statement of Facts (hereinafter, "SOF") ¶¶ 18-

3  19.[3]  As an association of employers, WRA and its members acted in concert

4  among themselves and as an integrated economic enterprise.  *See Maryland and*

5  *Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 465-66 (1960);

6  *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 824 (1978).  As part of

7  this enterprise, as will be discussed below, WRA directly or indirectly controlled

8  all aspects of the employment relationship with the workers, including recruitment;

9  hiring and firing; job placements and transfers; and ensuring compliance with legal

10  standards regarding wages, benefits, and working conditions.

11       Under DOL regulations governing the H-2A program, an employer's

12  participation in the program is conditioned on adherence to all regulatory program

13  requirements, not least of which is the requirement to ensure that workers are paid

14  at the highest of a regulatory "adverse effect wage rate" (or "AEWR"), the

---

16  *v. Presidio Valley Farmers' Ass'n*, 765 F.2d 1334 (5th Cir. 1985), the Fifth Circuit
held that an association of growers participating in the H-2A program is liable as a
17  joint employer for violations of migrant labor laws to the same extent as the
association's member growers who committed the violations.  *Salazar-Calderon*,
765 F.2d at 1346.

19  [3] WRA also identified itself as the "employer" in petitions filed with the U.S.
Department of Homeland Security for issuance of the H-2A visas needed for
20  plaintiffs and other H-2A workers to be admitted into the United States.  SOF ¶¶
24-25.

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 4

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

prevailing wage rage, or the federal or state minimum wage rate.  20 C.F.R. §§

655.103, 655.102(b)(9).  Moreover, the H-2A regulations require the employer to

comply with all federal and state employment-related laws, and the FLSA is such

an employment-related law.  20 C.F.R. § 655.103, 655.103(b); *Arriaga v. Florida*

*Pac. Farms, LLC*, 305 F.3d 1228, 1235 (11th Cir. 2002).  An H-2A employer's

obligation to comply with the FLSA is thus subsumed within the H-2A regulatory

requirements as a matter of law.

Such was the assessment of the Fifth Circuit in *Salazar-Calderon v. Presidio*

*Valley Farmers' Ass'n*, 765 F.2d 1334 (5th Cir. 1985), in affirming a district

court's finding that an H-2A growers association was an employer for purposes of

liability for its members' violations of the Farm Labor Contractor Registration

Act, which employs a definition of "employer" identical to that used in the FLSA.[4]

"The [growers association] cannot seriously challenge [the district court's] finding

since it repeatedly represented itself to be the plaintiffs' employer when applying

to the INS for the H-2 visas.  Indeed 'employer' status was necessary to obtain the

---

[4] The Farm Labor Contractor Registration Act ("FLCRA") and its successor
statute, the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA")
"relate[] to the FLSA, as 'employ' has the same meaning under both statutes and
the AWPA regulations provide that 'joint employment' under the [FLSA] is 'joint
employment' under the [AWPA].'"  *Moreau v. Air France*, 356 F.3d 942, 947 n.2
(9th Cir. 2004) (quoting 29 C.F.R. § 500.20(h)(4)).

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 5

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1   visas since they could be granted only on the petition of the 'importing employer.'"

2   *Salazar-Calderon*, 765 F.2d at 1346.

3       WRA itself has publically acknowledged that its role and regulatory

4   responsibilities as an H-2A employer give rise to its liability under the FLSA and

5   other employment laws based on the conduct of its members.  Dr. James Holt, a

6   senior WRA economist, testified on behalf of WRA in October 2000 at a public

7   hearing before the California Industrial Workforce Commission.  SOF ¶4.  In his

8   testimony, Dr. Holt stated that, as a "joint employer" under the H-2A program,

9   WRA is a "guarantor[] of the contract terms that the individual members contract

10  for."  SOF ¶7.  Dr. Holt submitted a report on behalf of WRA, explaining WRA's

11  legal obligations to the workers jointly employed by it and its members:

12          The Western Range Association has voluntarily organized itself as a
            "joint employer association" within the meaning of the H-2A
13          regulations.  This means the Association assumes joint liability with
            its members for compliance with the H-2A program requirements and
14          all employment related laws and regulations.  For example, if a
            member files for bankruptcy and fails to pay the herders, the WRA
15          will assure that the herders are paid.

16  SOF ¶8.

17      Having affirmatively taken on the role of an H-2A employer in its

18  relationship with the plaintiffs, WRA assumed responsibilities and obligations

19  under the FLSA that it cannot now evade.  In light of these undisputed facts, the

20

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 6

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    Court should find that WRA employed the plaintiffs and is responsible for

2    compliance with the FLSA as a matter of law.

3    **B. WRA Employed Plaintiffs Under the FLSA**

4        **1.    Under the FLSA, "employ" is defined expansively**

5

6        Whether a party is an "employer" under the FLSA is a question of law,

7    *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.

8    1983); the terms parties use to describe their relationship are not controlling.

9    *Purdham v. Fairfax County Sch. Bd.*, 637 F.3d 421, 429 (4th Cir. 2011). *See also*

10   *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979)

11   ("Economic realities, not contractual labels, determine employment status for the

12   remedial purposes of the FLSA.").

13       In determining whether an employer-employee relationship exists under the

14   FLSA, "[t]he language of the statute is the place to start."  *Sec'y of Labor v.*

15   *Lauritzen*, 835 F.2d 1529, 1543 (7th Cir. 1987).  In every aspect, the FLSA defines

16   the employer-employee relationship broadly, and its terms are "to be liberally

17   construed to apply to the furthest reaches consistent with Congressional direction."

18   *Biggs v. Wilson*, 1 F.3d 1537, 1539 (9th Cir. 1993).

19       Under the FLSA, the term "'[e]mploy' includes to suffer or permit to work."

20   29 U.S.C. § 203(g); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 n.1 (2005).  The "suffer

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 7

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1   or permit" standard is one of "striking breadth."  *Nationwide Mut. Ins. Co. v.*

2   *Darden*, 503 U.S. 318, 326 (1992); *see also Torres-Lopez v. May*, 111 F.3d 633,

3   638 (9th Cir. 1997) ("The FLSA broadly defines the employer-employee

4   relationships subject to its reach.") (citation omitted).  Courts have likewise

5   "adopted an expansive interpretation of the definitions of 'employer' and

6   'employee' under the FLSA, in order to effectuate the broad remedial purposes of

7   the Act."  *Real*, 603 F.2d at 754.  An "employer" under the FLSA "includes any

8   person acting *directly or indirectly* in the interest of an employer . . . ."  29 U.S.C.

9   § 203(d) (emphasis added).

10        An employee may have more than one employer under the FLSA.  29 C.F.R.

11   § 791.2(a) ("A single individual may stand in the relation of an employee to two or

12   more employers at the same time . . . ."); *see also Falk v. Brennan*, 414 U.S. 190,

13   195 (1973).  "When more than one entity is an employer for purposes of the FLSA,

14   the entities are termed 'joint employers.'"  *Torres-Lopez*, 111 F.3d at 638.  All

15   joint employers are individually responsible for compliance with the FLSA.  29

16   C.F.R. § 791.2(a) (1981); *Bonnette*, 704 F.2d at 1469.

17       **2.**    **The "economic reality" test**

18        An entity employs an individual under the FLSA "if, as a matter of

19   economic reality, the individual is dependent on the entity."  *Gonzalez-Sanchez v.*

20   *Int'l Paper Co.*, 346 F.3d 1017, 1020 (11th Cir. 2003) (citation omitted); *see also*

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 8

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1   *Bonnette*, 704 F.2d at 1469; *Boucher v. Shaw*, 572 F.3d 1087, 1091(9th Cir. 2009)

2   (the economic reality of the relationship is "the touchstone" for determining FLSA

3   employee status).  "Where an individual exercises 'control over the nature and

4   structure of the employment relationship,' or 'economic control' over the

5   relationship, that individual is an employer within the meaning of the [FLSA], and

6   is subject to liability."  *Boucher*, 572 F.3d at 1090 (quoting *Lambert v. Ackerly*,

7   180 F.3d 997, 1012 (9th Cir. 1999) (en banc) (internal quotation marks and

8   citations omitted)).

9          The Ninth Circuit employs a four-factor test from *Bonnette* in considering

10  whether an entity is a joint employer under the FLSA. The *Bonnette* factors

11  examine whether the alleged employer (1) had the power to hire and fire; (2)

12  supervised and controlled work schedules or conditions of employment; (3)

13  determined the rate or method of payment; and (4) maintained employment

14  records.  704 F.2d at 1470.  However, as the *Bonnette* court has instructed, "this is

15  not a mechanical determination….The four factors…[may] provide a useful

16  framework for analysis in [a given] case, but they are not etched in stone and will

17  not be blindly applied."  *Id.*  For this reason, "[t]he presence of any individual

18  factor is not dispositive of whether an employee/employer relationship exists."

19  *Real*, 603 F.2d at 754.  Rather, "[t]he ultimate determination must be based 'upon

20  the circumstances of the whole activity.'"  *Bonnette*, 704 F.2d at 170 (quoting

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 9

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

*Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  In examining the

undisputed facts in their totality, it is clear that the plaintiffs in this case were

dependent on WRA as a matter of economic reality.

**C.  Plaintiffs were Dependent on WRA as a Matter of Economic Reality**

**1.  WRA hired the plaintiffs and had the power to fire them**

The facts show that WRA recruited, hired, and brought plaintiffs to the

United States to work as H-2A sheepherders.  WRA controlled the employment

relationship from the moment the plaintiffs first contemplated working as

sheepherders in the United States.  WRA recruited and engaged the plaintiffs as

prospective employees through a recruitment coordinator who WRA retained in

the plaintiffs' home country, Chile.  SOF ¶¶31-33.  During the hiring process,

WRA provides prospective H-2A employees with a Pre-Employment Notice of

Rights and Obligations, prepared and signed by WRA's Executive Director,

Dennis Richins.  SOF ¶¶ 35-36.  The pre-employment notice describes the terms

and conditions of the prospective workers' employment, informs the workers that

they are subject to transfer from one WRA member to another, and advises them to

contact WRA after arriving in the United States if they are "having any problems"

or "become[] unemployed."  SOF ¶35.  WRA obtains the H-2A visas necessary

for the workers to come into the United States, assigns them to their U.S.

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 10

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

worksites, and arranges and pays for their transportation from Chile to their worksites.  SOF ¶¶27-28, 40-41.  WRA was thus in complete control over the hiring process, and plaintiffs were entirely dependent on WRA, as a matter of economic reality, for securing jobs under the H-2A program, and for making it possible to come to this country to work in those jobs.

WRA likewise had the power to fire the plaintiffs.  Under the terms of WRA's sheepherder employment agreement, a standard form contract signed by every WRA sheepherder, WRA has the right to terminate the employment of any herder found in willful breach of contract.  SOF ¶69.  The sheepherder employment agreement also provides that WRA is a necessary party to any termination of a worker by mutual agreement.  SOF ¶70.   In addition, WRA has the power to dismiss workers who refuse transfer assignments from one member to another. SOF ¶57.  Finally, WRA's power to fire is exclusive because individual WRA members cannot terminate a herder's employment; they can only refer the herder to WRA for reassignment.  SOF ¶71.

Thus, WRA clearly satisfies the first of the *Bonnette* factors.

## 2. WRA had the power to supervise and control the plaintiffs' work schedules or conditions of employment

Upon arrival in the United States, WRA required the plaintiffs to enter into a "sheepherder employment agreement" with the WRA members to whom WRA

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 11

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    had assigned them.  SOF ¶¶42, 44.  This agreement sets out WRA-required terms

2    and conditions of the H-2A worker's employment, some of which are terms

3    mandated by the H-2A regulations.  SOF ¶¶ 43, 46.  Although WRA is not

4    nominally a party, the agreement is a standard WRA form, and WRA does not

5    allow its members or the herders to negotiate or make any changes to its terms.

6    SOF ¶43.  Accordingly, WRA "exercises control over the nature and structure of

7    the employment relationship," making it an "employer" under the FLSA.  *Boucher*,

8    572 F.3d at 1090 (internal quotation marks omitted).  *Accord, Salazar-Calderon*,

9    765 F.2d at 1346 (grower association was a joint employer under the FLCRA

10    where it determined the terms and conditions of employment that would be offered

11    to H-2 visa workers).

12          WRA's control over its H-2A herders' employment conditions is further

13    shown by its power to reassign herders from one WRA member to another.  SOF

14    ¶¶56-68.  *Accord, Salazar-Calderon*, 765 F.2d at 1346 (agricultural association

15    was a joint employer under the FLCRA where workers could be shared among the

16    association's members).  WRA's sheepherder employment agreement grants WRA

17    the exclusive power to assign herders to its members and to transfer herders among

18    its members.  SOF ¶¶57-58.  WRA employs a transfer coordinator responsible for

19    arranging transfers requested by a herder or a member and maintains a regular

20    listing of herders available for transfer.  SOF ¶¶59-60.  Two of the plaintiffs

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 12

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    themselves experienced WRA transfers at various times during their employment

2    with WRA.  SOF ¶61.

3         WRA may transfer workers among its members for a variety of reasons.  If a

4    member runs out of work for a sheepherder, WRA will transfer the worker in order

5    to ensure that the worker receives the three-quarters work guarantee required by

6    the H-2A regulations.  SOF ¶64; *see* 20 C.F.R. § 655.102(b)(6).  WRA encourages

7    the use of transfers as a means of resolving workplace problems that may occur

8    between members and herders.  SOF ¶¶63, 65-68.  No matter the reasons, WRA

9    must consent to any transfer of a worker; WRA members may not transfer workers

10   among themselves without the association's involvement, or WRA would lose

11   control over worker assignments.  SOF ¶58.  If a herder objects to a transfer, WRA

12   "will consider the worker's concerns," but a worker who refuses a transfer "may be

13   subject to dismissal."  SOF ¶57.

14        Although WRA does not supervise its herders' day-to-day work for its

15   rancher members, this "does not preclude a determination that [an entity employs]

16   temporary workers within the broad definition of the FLSA."  *Baystate Alternative*

17   *Staffing, Inc. v. Herman*, 163 F.3d 668, 676 (1st Cir. 1998) (applying the *Bonnette*

18   test and concluding that a temporary staffing agency that placed workers at

19   unskilled jobs at client worksites employed the workers, despite the fact that the

20   agency did not exercise direct on-the-job supervision at the client companies, but

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 13

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

where it did have sole responsibility for hiring the workers, determined their worksite assignments, and controlled terms and conditions of employment); *see also Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1987) ("An employer does not need to look over his workers' shoulders every day in order to exercise control.").  The lack of direct job supervision by WRA should be given little weight precisely because of the nature of range sheepherding, where the worker is "on call 24 hours a day, 7 days a week, and in most cases will be alone" and not directly supervised by anyone.  *See* DOL Field Memorandum No. 24-01 (issued August 1, 2001), SOF ¶117.

More significantly, an entity that does not exercise direct supervision of an employee's work may still be a FLSA "employer" where it retains the authority to intervene where problems arise between the worker and the immediate employer. *Bonnette*, 704 F.2d at 1470; *Baystate*, 163 F.3d at 676.  *Accord*, *Torres-Lopez*, 111 F.3d at 643 (indirect control or supervision is not inconsistent with a joint employment relationship under the AWPA).  In this case, WRA exercises substantial indirect control over the herders' working conditions and has the power to intervene where problems arise between a member and a herder.

WRA encourages herders to contact WRA in the event that problems arise in the course of their employment and maintains records of sheepherder complaints. SOF ¶¶38, 50.  Where a member has mistreated a herder, WRA may reassign the

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 14

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

herder to another member using its transfer power described above.  WRA also has the power to terminate members who violate herder employment conditions or otherwise mistreat workers.  SOF ¶¶72-75.  WRA may suspend or terminate the membership of a member rancher who fails to comply with association rules or legal requirements, including DOL rules and regulations.  SOF ¶¶13, 72-73. Members are likewise subject to termination of membership if they mistreat a WRA sheepherder.  SOF ¶74.  Finally, as previously noted, WRA serves as a guarantor of its herders' work contracts and will pay a herder in the event that a WRA member is unable to pay.  SOF ¶¶9, 12, 15.  WRA's sheepherder employment agreement specifically contemplates claims by sheepherders against WRA, "including but not limited to any claim by the Employee for wages or damages of any kind."  SOF ¶49.

For all these reasons, WRA satisfies the second prong of the *Bonnette* test.

### 3.        WRA determines the rate or method of payment to its herders

WRA exerts substantial control over its sheepherders' wage and benefits. WRA will not permit members to offer wage rates lower than those required under the H-2A regulations.  SOF ¶51.  WRA also requires its members to provide worker's compensation insurance to workers assigned to them, as required under the H-2A rules.  SOF ¶52.  Moreover, WRA requires its members to provide sheepherders with benefits above and beyond those required by the H-2A

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 15

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

regulations, including health and life insurance.  SOF ¶53.  Specifically, WRA

provides health and life insurance to WRA herders pursuant to a group employer

insurance plan that covers both the sheepherders and WRA's office staff.  SOF ¶¶

53, 55.  WRA's sheepherder employment agreement requires the herders to pay

half of the monthly premium for such insurance coverage.  SOF ¶53.

Thus, WRA satisfies the third prong of the *Bonnette* test.

## 4. WRA maintains employment records for its herders

WRA maintains employment files, called "herder files," for all of its

sheepherders, containing copies of their employment contracts, labor certification

paperwork, travel information, and transfer records.  SOF ¶50.  In addition, any

records made by WRA personnel as to a complaint by or about a herder would be

kept in the herder's file.  *Id.*

Accordingly, WRA satisfies the fourth prong of the *Bonnette* test and jointly

employed the plaintiffs under the FLSA as a matter of law.

## IV.  THE "RANGE PRODUCTION OF LIVESTOCK" EXEMPTION UNDER THE FLSA DOES NOT APPLY

The plaintiffs were not paid at least the FLSA minimum wage for the work

they performed.  SOF ¶81 (Fernandez Answer, ¶ 11 (ECF No. 65)).  Although 29

U.S.C. § 213(a)(6)(E) exempts from the federal minimum wage those employees

"principally engaged in the range production of livestock," an employer has the

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 16

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    burden of pleading and proving any FLSA exemption.  *See Corning Glass Works*

2    *v. Brennan*, 417 U.S. 188, 196-97 (1974).  As the undisputed facts show, the

3    exemption is unavailable in this case.

4    **A.    The H-2A Wage Structure**

5            Federal law requires workers employed by H-2A employers to be paid at the

6    highest of the applicable federal or state minimum hourly wage rates, a prevailing

7    wage rate, or an hourly "adverse effect wage rate" (or "AEWR") established by the

8    DOL.  20 C.F.R. § 655.102(b)(9).  The federal minimum wage, established by the

9    FLSA, ranged from $5.15 per hour in 2007 to $7.25 per hour in 2010, while the

10   AEWR ranged from $9.77 per hour in 2007 to $10.85 per hour in 2010.[5]

11           However, certain employers of range sheepherders can avoid the general H-

12   2A hourly wage standards and instead operate under a set of "special procedures"

13   established by the DOL.  *See* DOL Field Memorandum No. 24-01 (issued August

14   1, 2001) and attached Special Procedures: Labor Certification for Sheepherders

15   Under the H-2A Program; SOF ¶ 115.  Under the sheepherder special procedures,

16   qualifying H-2A employers may pay range sheepherders a flat monthly wage,

17   regardless of the number of hours worked.  SOF ¶116.  The DOL's rationale for

18   _____

19   [5] The DOL has published historical federal minimum wage rates, including those
     in effect from 2007 through 2010, at http://www.dol.gov/whd/minwage/chart.htm.
20   With regard to the AEWR in effect from 2007 through 2010, *see* 72 Fed. Reg.
     7910 (Feb. 21, 2007); 72 Fed. Reg. 10289 (Feb. 26, 2008); 74 Fed. Reg. 26017
21   (May 29, 2009); 75 Fed. Reg. 7294 (Feb. 18, 2010).

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 17

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    the special procedures is the "extreme difficulty" of computing hours worked for

2    herders whose job requires them to spend extended periods of time grazing herds

3    of sheep in isolated mountain areas, where they are on call 24 hours a day, seven

4    days a week.  SOF ¶117.

5            The special procedures do not provide a blanket minimum wage exemption

6    for any and all work performed for a sheep ranching operation.  Rather, the special

7    procedures state explicitly that they are intended for workers whose duties fit

8    within the Dictionary of Occupational Titles ("DOT") description for

9    "sheepherder" (DOT 410.687-022) (SOF ¶118), and that they do not apply to those

10   workers who would be classified as "Farmworker, Livestock" (DOT 410.664.010)

11   (SOF ¶119).

12   **B.      The FLSA Exemption for Range Production of Livestock**

13           The DOL's special procedures apply only to H-2A employer requests for

14   "FLSA-exempt" sheepherders.  SOF ¶116.  This limitation to FLSA-exempt

15   employment only is critical because DOL has no authority to waive federal

16   minimum wage requirements for workers in H-2A employment.  *See Arriaga*, 305

17   F.3d at 1235.

18           A statutory exemption from FLSA's minimum wage requirements exists for

19   workers "principally engaged in the range production of livestock."  29 U.S.C. §

20   213(a)(6)(E).  For the exemption to apply, a worker's "primary duty must be range

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 18

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

production of livestock," which "necessitates his constant attendance on the range, on a standby basis, for such periods of time so as to make the computation of hours worked extremely difficult."  29 C.F.R. § 780.329(a); *see also Hodgson v. Elk Garden Corp.*, 482 F.2d 529, 531 (4th Cir. 1973).  "Furthermore, the legislative history indicates that this exemption was not intended to apply to feed lots or to any area where the stock involved would be near headquarters." 29 C.F.R. § 780.329(c).

In establishing this exemption, Congress did not elaborate on the meaning of the phrase "principally engaged in range production of livestock," but the DOL, the agency charged with enforcing the FLSA, has issued clarifying regulations.[6] For the exemption to apply, all of the following conditions must be met:

(1)  The worker must be "engaged in agriculture";
(2)  Be "principally engaged";
(3)  On the "range"; and
(4)  In the "production of livestock."

29 C.F.R. § 780.324 (a).

---

[6] These DOL interpretations are entitled to controlling weight.  *Long Island Care at Home Ltd. v. Coke*, 551 U.S. 158, 165 (2007) ("We have previously pointed out that the power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress, [and] [w]hen an agency fills such a 'gap' reasonably, and in accordance with other applicable (e.g., procedural) requirements, the courts accept the result as legally binding.") (citations and internal quotation marks omitted).

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 19

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    DOL regulations further define each of the operative terms of the

2    exemption.[7]

3    A worker is "principally engaged" in range production only if he spends
     *more than fifty percent of his time during the year* on the range, performing
4    range production duties.  29 C.F.R. § 780.325(a).  The employee's "*primary
     duty and responsibility…must be to take care of animals actively or stand in
5    readiness for that purpose*" for the exemption to apply.  *Id.* (emphasis
     added).

6
     The "range" is defined generally as land that is not cultivated, but rather
7    produces native forage for animal consumption.  29 C.F.R. § 780.326(a).
     The exemption is "not intended to apply to feed lots or to any area where the
8    stock involved would be near [ranch] headquarters."  29 C.F.R. §
     780.329(c).

9
     "Production of livestock" means "actively taking care of the animals or
10   standing by in readiness for that purpose."  29 C.F.R. § 780.327.  Exempt
     work may include "such immediately incidental duties as inspecting and
11   repairing fences, wells, and windmills," but not "such work as terracing,
     reseeding, haying, and constructing dams, wells, and irrigation ditches."  *Id.*

12
     As FLSA exemptions are to be construed narrowly, *Solis v. Washington*, 656

13   F.3d 1079, 1083 (9th Cir. 2011), "immediately incidental duties" potentially

14   subject to the exemption must be in direct and proximate support of the range

15   sheepherding duties for which the exemption was created.

16   In sum, the type of work that qualifies for the exemption is narrowly

17   circumscribed:  It does not include all work that may directly or indirectly be

18   useful in the raising of livestock, nor does it include all of the many kinds of work

19

20   _____

21   [7] Plaintiffs do not dispute that they were engaged in agriculture.

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 20

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    that may occur on a ranch that raises livestock on the range.  Rather, to qualify for

2    the exemption, an employee must spend more than fifty percent of his time in

3    activities **"which require constant attendance [of livestock] on a standby basis,**

4    **away from headquarters, such as herding, where the computation of hours**

5    **worked would be extremely difficult.  Such constant surveillance of livestock**

6    **that graze and reproduce on range lands is necessary to see that the animals**

7    **receive adequate care, water, salt, minerals, feed supplements, and protection**

8    **from insects, parasites, disease, predators, adverse weather, etc."** 29 C.F.R. §

9    780.329(c) (emphasis added).  Because the plaintiffs spent far less than half their

10   time engaged in range sheepherding, they were entitled to receive at least the

11   FLSA hourly minimum wage as a matter of law.

12   **C.**    **Plaintiffs' Work Did Not Qualify for the FLSA Exemption**

13          As Mr. Fernandez admits, only one sheepherder at any one time would care

14   for his sheep when they were taken to rangeland.  SOF ¶107.  However, during

15   plaintiffs' employment at Fernandez Ranch, Mr. Fernandez employed two or even

16   three sheepherders at a time.  SOF ¶112.  Since one sheepherder was all that was

17   needed to take the sheep out on the range, the other one or two sheepherders stayed

18   at the ranch, with no responsibilities for the sheep until they returned to the ranch

19   months later.  SOF ¶¶99, 103.  Each plaintiff spent over fifty percent of his time

20   performing general ranch work rather than range sheepherding.  SOF ¶¶91-106.

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 21

**Northwest Justice Project**
510 Larson Building, 6 S. 2ⁿᵈ St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    Accordingly, each of them was entitled to the applicable FLSA hourly wage for all

2    work performed.

3          Plaintiff Eduardo Martinez worked at Fernandez Ranch from January 5,

4    2010 until May 20, 2010, without ever working as a range sheepherder.  SOF ¶¶83-

5    91.  In his deposition, Max Fernandez testified that every year from December

6    until after lambing is finished in April, the sheep stay fenced in at the headquarters

7    ranch.  SOF ¶82.  Mr. Martinez' work in January and February consisted of

8    feeding the sheep, cows, and horses on the ranch twice per day.  SOF ¶84.  This

9    required loading hay bales onto pickup trucks, driving to the corrals, and unloading

10   the hay for the animals.  SOF ¶84.  He also worked under Mr. Fernandez'

11   supervision in cleaning up at the ranch and performing truck and machine

12   maintenance.  SOF ¶ 85.  In March and part of April 2010, Mr. Martinez worked a

13   14-hour shift in the lambing (helping with the birthing of lambs), which took place

14   at the lambing barn close to the ranch headquarters.  SOF ¶¶87, 111(a).  He slept in

15   the permanent ranch housing during this time. SOF ¶91.  After lambing finished,

16   Mr. Martinez worked cleaning up the ranch, worked with cows that were calving,

17   and helped prepare lambs to go out on the range.  SOF ¶88.  For one week, he took

18   the lambs off the ranch in the morning to pasture, and returned with them to the

19   ranch in the evening.  SOF ¶89.  After that one week, he had no further

20   responsibility with the sheep, and instead worked cleaning corrals, checking the

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 22

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    pick-up trucks, making firewood, and constructing a corral for cattle, until he left

2    the ranch on May 20, 2010.  SOF ¶90.  At no time did Mr. Martinez stay out

3    overnight on the range with the sheep.  SOF ¶91.  Rather, he worked regular hours

4    under the supervision of Max Fernandez on the ranch.  SOF ¶91.  Thus, as a matter

5    of law, Mr. Martinez' duties were not subject to the FLSA exemption for range

6    sheepherding.

7         Plaintiff Elvis Ruiz arrived at Fernandez Ranch in August 2007 and worked

8    there continuously until January 3, 2010.  SOF ¶92.  Mr.  Ruiz spent a total of

9    about one month each fall and then one five-month summer season working with

10   the sheep away from the ranch headquarters over the course of his two-plus years'

11   employment at Fernandez Ranch.  SOF ¶¶92-100.   For the balance of his

12   employment with Fernandez Ranch, Mr. Ruiz worked as a general ranch worker.

13   SOF ¶¶99-100.

14        In September 2007, Mr. Ruiz first took the sheep to graze near the ranch for

15   about one month. SOF ¶92.  In October 2007, he grazed the sheep at the

16   headquarters ranch for about fifteen days, until the lambs were sold, after which he

17   started leaving the sheep each morning to graze on nearby pastures, returning in

18   the evening to bring them back to the ranch for the night.  SOF ¶93.  Several of

19   these grazing locations were actually fenced pasture or crop land located close to

20   the headquarters ranch, which did not meet the definition of "range" in 29 C.F.R. §

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 23

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

780.326(a).  SOF ¶111.  Meanwhile, during the day, he performed general ranch chores such as preparing the land for planting, changing the oil in the tractors, taking firewood to Mr. Fernandez' home, feeding the cows and horses, and repairing fences.  SOF ¶93.

During the winter months, the sheep stayed in the corral, and Mr. Ruiz lived at the ranch, feeding the sheep, cows, and horses, and performing other general ranch tasks such as taking firewood to Mr. Fernandez' home.  SOF ¶95.  In March 2008, Mr. Ruiz worked a shift helping with the lambing.  SOF ¶96.  From late April to September 2008, Mr. Ruiz herded sheep off the ranch, except for one week in July in which he worked and slept at the ranch between grazing locations. SOF ¶97.  In October 2008, he grazed the sheep near the ranch three days per week, performing general ranch chores the other four days per week.  SOF ¶97.  In November 2008, he pastured the sheep on the ranch, vaccinated the sheep and cows, and continued doing ranch chores.  SOF ¶97.  After October 2008, he never again took the sheep off the ranch.  SOF ¶¶97-100.  From December 2008 through February 2009, Mr. Ruiz lived on the ranch, fed the sheep, cows and horses in the corrals, and performed other ranch tasks unrelated to sheepherding such as repair machinery, maintain equipment, and run errands into Goldendale to pick up meat scraps for the dogs or transport machinery parts.  SOF ¶95.  In March and April 2009, he worked a shift lambing on the ranch.  SOF ¶96.  In late April 2009,

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 24

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1    Francisco Castro took the sheep off the ranch to graze until September, and Mr.

2    Ruiz did only general ranch work while he was gone.  SOF ¶99.  Mr. Fernandez

3    disputes that Elvis Ruiz did some of the ranch work claimed.  However, Mr.

4    Fernandez admits that only one sheepherder at a time would take the sheep away

5    from the ranch at any one time.  SOF ¶107.  It is Mr. Fernandez' contention that

6    Mr. Ruiz had *no duties at all* during this five-month period, other than to bring

7    food and fresh horses out to Mr. Castro.  SOF ¶114.  The specific duties performed

8    and hours worked by Mr. Ruiz during these five months may be in dispute.  What

9    is uncontested is that Mr. Ruiz did not work as a range sheepherder at all in 2009.

10   SOF ¶98.  Accordingly, Mr. Ruiz' work was not subject to the FLSA exemption

11   for range sheepherding as a matter of law.

12        Francisco Castro first arrived at the Fernandez Ranch in March 2008.  He

13   did not take the sheep away from the ranch until late April or May of the following

14   year, 2009.  SOF ¶101.  Instead, he worked at the ranch headquarters under Mr.

15   Fernandez' direct supervision, sleeping at the ranch housing, from his arrival in

16   March 2008 until he requested a transfer to a different ranch in October 2008. SOF

17   ¶102.  Mr. Castro built a fence on the property across the road from the main

18   ranch, helped build a large metal hay storage structure, and performed general

19   ranch chores.  SOF ¶102.  His duties from late April until September did not

20   include caring for sheep, as Elvis Ruiz had then taken the sheep to graze away

21

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 25

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1  from the main ranch.  SOF ¶103.   In March 2009, Mr. Castro returned to

2  Fernandez Ranch and remained there until March 30, 2010.  SOF ¶104.  During

3  this twelve-month period, he spent only five months tending the sheep away from

4  the main ranch, some of which may or may not have been range sheepherding

5  consistent with the FLSA exemption.  SOF ¶104.  For example, for a time in July

6  2009, Mr. Fernandez ordered Mr. Castro to leave the sheep grazing in a pasture

7  during the day while Mr. Castro returned to the ranch to perform ranch work, and

8  then to return to watch the sheep at night.  SOF ¶104. The rest of the time, Mr.

9  Castro worked under Mr. Fernandez' direct supervision on the ranch, sleeping in

10  the ranch housing.  SOF ¶105.

11      In short, when his sheep were taken to graze away from the ranch, Max

12  Fernandez needed only one sheepherder to care for the sheep at any one time.

13  However, during plaintiffs' employment at Fernandez Ranch, WRA provided Mr.

14  Fernandez with two or even three H-2A workers at a time.  Since one sheepherder

15  was all that was needed to care for the sheep, the other one or two sheepherders

16  stayed at the ranch, did no work on the range, and had no responsibilities for the

17  sheep at all.  As the facts show that none of the plaintiffs worked in range

18  sheepherding for more than fifty percent of their employment at Fernandez Ranch,

19  none of their work is subject to the FLSA exemption for the range production of

20  livestock.

21

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

## V.    BREACH OF CONTRACT

### A.    H-2A Program Requirements Formed Part of Plaintiffs' Work Contracts

The DOL requires employers seeking to import H-2A workers to offer those workers certain minimum terms of work, 20 C.F.R. §§ 655.102-103, including a guarantee that the offered wage is "at least the adverse effect wage rate in effect at the time the work is performed, the prevailing hourly wage rate, or the legal federal or state minimum wage rate, whichever is highest."  20 C.F.R. § 655.102(b)(9). The employer must also agree to "[c]omply with applicable Federal, State, and local employment-related laws and regulations."  20 C.F.R. § 655.103(b).  The AEWR is an hourly wage set by the DOL based upon periodic agricultural employer surveys to ensure that the employment of foreign workers will not adversely affect the wages of similarly-employed U.S. workers.  20 C.F.R. § 655.107.

Employment terms and conditions mandated by DOL as a condition of approving an employer's H-2A petition are incorporated into an H-2A worker's work contract as a matter of law.  20 C.F.R. § 655.102(b)(14) ("the required terms of the job order and application for temporary alien agricultural labor certification shall be the work contract"); 29 C.F.R. § 501.10(d) ("work contract" means "all the material terms and conditions of employment relating to wages, hours, working conditions, and other benefits, including those terms and conditions required by the

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 27

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

applicable regulations [relating to the H-2A labor certification process]").  *See also*

*Frederick County Fruit Growers Ass'n v. Martin*, 968 F.2d 1265, 1268 (D.C. Cir.

1992) (employers' promises in the job clearance order "create[] a contractual

obligation running from that [employer] to each of its workers"); *Salazar-*

*Calderon*, 765 F.2d at 1342 (employers' assurances required by the "H-2"

regulations—now the H-2A program—are incorporated into workers' contracts as

a matter of law); *Perez Benitez v. Candy Brand LLC*, No. 1:07-cv-1048, 2011 WL

1978414 at *15-16 (W.D. Ark., May 20, 2011) (same); *Martinez-Bautista v. D&S*

*Produce*, 447 F. Supp. 2d 954, 960 (E.D. Ark. 2006) (same).

WRA's own Dr. James Holt has acknowledged that the WRA's joint

employer relationship with H-2A workers means that WRA is "a joint guarantor

with its members of the written employment contract entered into with every

sheepherder."  SOF ¶¶9, 15.

## B.    Defendants Breached Plaintiffs' Contracts

Defendants violated the wage provisions of plaintiffs' contracts in two ways.

First, because the plaintiffs were not exempt from the FLSA minimum wage as

explained above, the defendants breached their contractual duty to pay "no less

than the legal federal . . . minimum wage rate."  20 C.F.R. § 655.102(b)(9).

Second, because the plaintiffs were principally employed as general ranch

hands rather than as sheepherders, defendants breached the plaintiffs' contracts by

1    not paying them the significantly higher amounts they should have earned under

2    the applicable AEWR.  *See id.* (H-2A employers promise DOL to pay employees

3    "the highest of the [AEWR], the prevailing hourly or piece rate, or the Federal or

4    State minimum wage"); *see also id.* at 655.103(b) (H-2A employers agree to

5    "[c]omply with applicable Federal, State, and local employment-related law and

6    regulations").  WRA applied for visas pursuant to DOL's special procedures for

7    range sheepherders, which specify an AEWR of $750 per month for Washington

8    sheepherders.  However, the special procedures make clear that they are intended

9    to be used only for workers principally engaged in range sheepherding.  As

10   discussed at Section IV above, the undisputed facts show that the plaintiffs were

11   principally engaged in general ranch activities other than sheepherding.  Therefore,

12   the defendants breached the plaintiffs' contracts as a matter of law.

13   **VI.    PLAINTIFFS WERE EMPLYED IN COMMERCE FOR
             PURPOSES OF THE FLSA**

14
15        The FLSA covers employees who are engaged in commerce or in the

16   production of goods for commerce.  29 U.S.C. § 206(a).  An employee engaged in

17   an activity essential to production of goods, where it can reasonably be anticipated

18   that some part of the goods will move in interstate commerce, satisfies this burden.

19   *See* 29 C.F.R. §§ 776.8-.21.

20        Plaintiffs were clearly engaged in interstate commerce.  They performed

21   work at Fernandez Ranch that was necessary to the production of lambs and

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 29

**Northwest Justice Project**
510 Larson Building, 6 S. 2ⁿᵈ St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

calves.  It is undisputed that during the period of time plaintiffs worked at his

ranch, Max Fernandez sold his livestock to Roy Rucker, a buyer residing in

Oregon who would pick up the sheep at Fernandez' place of business.  SOF ¶109.

Plaintiffs raised, fed, and protected the sheep.  Thus, they had a close and

immediate tie to the production of livestock for interstate commerce, and were

engaged in commerce under the FLSA as a matter of law.

## VII.   CONCLUSION

For all of the foregoing reasons, the Court should grant partial summary

judgment to the plaintiffs as requested.


Dated this 12<u>th</u> day of  December, 2012.


NORTHWEST JUSTICE PROJECT


___/s/ Michele Besso_____
Michele Besso, WSBA #17423


FARMWORKER JUSTICE

By: /s/ Weeun Wang
Weeun Wang

Attorneys for Plaintiffs

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT - 30

**Northwest Justice Project**
510 Larson Building, 6 S. 2nd St.,
Yakima, Washington 98901
Phone: (509) 574-4234  Fax: (509) 574-4238

1

CERTIFICATE OF SERVICE

2


3        I hereby certify that on this 12th day of December, 2012, I electronically

4  filed the foregoing with the Clerk of the Court using the CM/ECF system which

5  will send notification of such filing to the following:

6            John Barhoum:  jbarhoum@dunncarney.com

7            Timothy J. Bernasek: tbernasek@dunncarney.com

8            Gary Lofland: glofland@glofland.net

9            Weeun Wang: wwang@farmworkerjustice.org

10           John Jay Carroll: jcarroll@vhlegal.com

11


12  DATED this 12th day of December, 2012.

13


14                    /s/ Alex Galarza
                     Alex Galarza, Legal Assistant for
15                   Michele Besso, WSBA  #17423
                     Attorney for Plaintiffs
16                   Northwest Justice Project

17

18

19

20

21