UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

ELVIS RUIZ, et al.,

                       Plaintiffs,

     v.

MAX FERNANDEZ, et al.,

                     Defendants.

NO:  CV-11-3088-RMP

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

**BEFORE THE COURT** are motions for summary judgment filed by

Defendant Western Range Association ("Western Range"), ECF No. 130,

Defendants Max and Ann Fernandez ("Fernandez"), ECF No. 135, and Plaintiffs

Francisco Javier Castro, Eduardo Martinez, and Elvis Ruiz ("Plaintiffs"), ECF No.

140.  The Court heard oral argument on the motions.  Michele Besso appeared on

behalf of Plaintiffs.  Timothy J. Bernasek appeared for Defendant Western Range,

and Gary E. Lofland appeared on behalf of Defendants Fernandez.  The Court has

considered the briefing and the file and is fully informed.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 1

BACKGROUND

The "H-2A program," as provided for in the Immigration and Nationality Act ("INA"), allows for the issuance of visas to foreign workers who "ha[ve] a residence in a foreign country which [they] ha[ve] no intention of abandoning [and] who [are] coming [] to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature."  8 U.S.C. § 1101(a)(15)(H).  H-2A visas may be granted only when there are "not sufficient workers who are able, willing, and qualified . . . to perform the labor or services involved" and "the employment of the [foreign worker] . . . will not adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1188(a)(1).

Plaintiffs in this case are three Chilean sheepherders who came to the United States under the H-2A program and worked on Defendant Max Fernandez's ranch. Plaintiffs were recruited for this work by Defendant Western Range Association, which is a membership organization made up of approximately 200 sheep ranches. Fernandez owns one of Western Range's member ranches.

Western Range acts as a "joint employer" of the H-2A workers, including Plaintiffs, under the United States Department of Labor regulations governing the program.  Western Range obtained H-2A program certification, in the course of which Western Range was required to provide assurances to the United States

Department of Labor that it would comply with all regulations and applicable federal, state, and local employment-related laws.  Western Range further petitioned the United States Department of Homeland Security to issue H-2A visas for each of the individual sheepherders that it recruited and brought to the United States.  Only an employer is permitted to petition for the issuance of H-2A visas.

Western Range arranges for each sheepherder's transportation to the United States once an H-2A visa is obtained and provides the up-front payment for their transportation.  Western Range then places the sheepherder with one of its member ranches.  Western Range often transfers its sheepherders between ranches, either to satisfy the amount of work guaranteed to the sheepherder, or as a solution to any problems that might arise between sheepherders and member ranches.

H-2A regulations require the employer to pay a wage that is the highest of the adverse effect wage rate,[1] the prevailing wage, or the state or federal minimum

---

[1] The "adverse effect wage rate" is "[t]he annual weighted average hourly wage for field and livestock workers (combined) in the States or regions as published annually by the U.S. Department of Agriculture (USDA) based on its quarterly wage survey."  20 C.F.R. § 655.103(b).  The purpose of the adverse effect wage rate is "to ensure that the wages of similarly employed U.S. workers will not be adversely affected" by the employment of H-2A workers.  20 C.F.R. § 655.1300.

wage, "except where a special procedure is approved for an occupation or specific class of agricultural employment." 20 C.F.R. § 655.120. Employers who are offering employment for range sheepherders are permitted to offer a monthly wage rather than an hourly minimum wage pursuant to "special procedures" adopted by the Department of Labor. The monthly wage for range sheepherding in effect for Washington State at all times relevant to this suit was $750.00 per month.

In this case, Western Range placed each Plaintiff as an H-2A sheepherder at Fernandez' ranch for at least a period of their employment. Plaintiff Francisco Javier Castro was initially employed on the Fernandez ranch from March 18, 2008, through October 9, 2008. Castro was then transferred to another member ranch where he worked for a number of months. Castro was transferred back to the Fernandez ranch on March 4, 2009, and continued to work there until April 1, 2010.

Plaintiff Martinez initially began his employment as a sheepherder with other member ranches and transferred to the Fernandez ranch on January 4, 2010. Martinez left the ranch on May 24, 2010. Plaintiff Elvis Ruiz was employed on the Fernandez ranch for the entirety of his employment as a range sheepherder, from August 10, 2007, to January 3, 2010.

Plaintiffs assert that Fernandez required them to perform many tasks other than range sheepherding for significant portions of the time that they were

employed as sheepherders on his ranch.  Plaintiffs additionally assert that

Fernandez mistreated them in other ways, including denying them their breaks,

threatening to have them deported, not providing them adequate food, and placing

them in housing that did not meet the minimum health and safety standards

required by the H-2A program.  Plaintiffs Ruiz and Castro also assert that

Fernandez took their passports from them upon their arrival on the Fernandez

ranch and withheld the passports for a period of many months.

Plaintiffs initially filed a complaint with the Department of Labor ("DOL")

regarding their alleged mistreatment on the Fernandez ranch.  The DOL

investigated the complaint, including speaking with Fernandez, Plaintiffs, and

other sheepherders on Fernandez' ranch.  The DOL investigator issued a narrative

report in which he found that Fernandez had not kept adequate records of payment

for Plaintiffs Ruiz and Castro.  The investigator recommended that Fernandez be

ordered to pay Plaintiff Ruiz $6,000.00 in back wages and Plaintiff Castro

$7,182.00 in back wages, based on Plaintiffs' contracted rate of $750.00 per month

as range sheepherders.  There is no dispute that Fernandez paid the wages that the

investigator concluded Plaintiffs were owed.

The investigator found that Plaintiffs' other claims were generally not valid,

including Plaintiffs' claim that they were not paid at the proper rate under the H-

2A regulations because they performed work other than range sheepherding.  The

1    DOL investigator additionally examined Western Range's relationship with

2    Fernandez, but did not make a finding that Western Range owed the Plaintiffs any

3    back wages.  See ECF No. 133-4 at 3.

4        Plaintiffs filed suit in this Court against Fernandez and Western Range for

5    damages arising from their time of employment on the Fernandez ranch.  Plaintiffs

6    assert causes of action against Fernandez and Western Range for violations of

7    Washington State wage law, RCW 49.52.050; breach of employment contracts;

8    and for quantum meruit under an implied contract theory.  Plaintiffs additionally

9    assert a claim against Defendant Western Range for violations of the Fair Labor

10   Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and against Fernandez for

11   violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"),

12   18 U.S.C. §§ 1589 *et seq.*  ECF No. 1.

13       Defendants Western Range and Fernandez each separately move for

14   summary judgment on all of Plaintiffs' claims. ECF Nos. 130, 135.  Plaintiffs

15   move for partial summary judgment on their FLSA claim against Western Range

16   and breach of employment contracts against both Western Range and Fernandez.

17   ECF No. 140.  The Court has federal question jurisdiction over Plaintiffs' FLSA

18   and TVPRA claims pursuant to 28 U.S.C. § 1331 and exercise supplemental

19   jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The

20   Court applies state substantive law to those claims heard on supplemental

1    jurisdiction.  *Mason & Dixon Intermodal, Inc. v. Lapmaster Inter'l, LLC.,* 632 F.3d

2    1056, 1060 (9th Cir. 2011).

3                                      ANALYSIS

4          Summary judgment is appropriate when there are no genuine issues of

5    material fact and the moving party is entitled to judgment as a matter of law.

6    Federal Rule of Civil Procedure 56(a).  A "material" fact is one that is relevant to

7    an element of a claim or defense, and whose existence might affect the outcome of

8    the suit.  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630

9    (9th Cir. 1987).  The party asserting the existence of a material fact must show

10   "sufficient evidence supporting the claimed factual dispute . . . to require a jury or

11   judge to resolve the parties' differing versions of the truth at trial."  *Id.* (quoting

12   *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).  The mere

13   existence of a scintilla of evidence is insufficient to establish a genuine issue of

14   material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

15         The moving party bears the initial burden of demonstrating the absence of a

16   genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

17   (1986).  If the moving party meets this burden, the burden then shifts to the non-

18   moving party to "set out specific facts showing a genuine issue for trial."  *Id.* at

19   324 (internal quotations omitted).  The nonmoving party "may not rely on denials

20   in the pleadings, but must produce specific evidence, through affidavits or

admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  In deciding a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *T.W. Elec. Serv.*, 809 F.2d at 631-32.

**A. The DOL's narrative report**

Each of the parties raises an issue as to the admissibility or effect of the DOL narrative report regarding Plaintiffs' complaints against Fernandez. Defendant Fernandez requests summary judgment on Plaintiffs' claims under Washington State wage law, breach of employment contract, and for quantum meruit on the basis that the DOL report bars Plaintiffs from seeking redress in this court.  Western Range asserts that the DOL report provides evidence that it was not a joint employer of Plaintiffs under the FLSA or Washington State wage law. Plaintiffs assert that the DOL narrative report may not be considered at summary judgment because it constitutes inadmissible hearsay.  *See* Fed. R. Civ. P. 56(c)(2) (a trial court ruling on a motion for summary judgment may consider only those facts supported by admissible evidence).

Before evaluating the substance of the parties' arguments for summary judgment on Plaintiffs' claims, the Court must first evaluate the admissibility and effect of the DOL's narrative report.

*1.  Admissibility of the report*

Plaintiffs assert that the Court should not consider the DOL report in ruling on the summary judgment motions because the report constitutes inadmissible hearsay.  In the alternative, Plaintiffs argue that certain portions of the report should be disregarded as containing hearsay-within-hearsay or legal conclusions.

Under Federal Rule of Evidence 803(8), a public record or report is not excluded by the hearsay rules in a civil case if it sets out "factual findings from a legally authorized investigation" and "neither the source of information nor other circumstances indicate a lack of trustworthiness."  Documents that fall within Rule 803(8) "are presumed trustworthy, placing the burden of establishing untrustworthiness on the opponent of the evidence."  *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997) (internal quotation omitted); *see also Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992) ("A party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted.").

Relevant factors in determining the trustworthiness of a public report include "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation."  *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d

770, 778 (9th Cir. 2010) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n.11 (1988)).

The Court finds that the DOL report is trustworthy. There is no evidence that the report is untimely. The investigation covers the period from September 20, 2008, through September 18, 2010, and the report contains a series of narratives beginning on the date of February 1, 2011. The report also indicates that a "final conference" was held with Max Fernandez on April 21, 2011, to discuss the findings of the report. The investigator's skill or experience is not explicitly set forth in the report, but the report contains an identifiable DOL case number and states that it was prepared by a "Wage and Hour Investigator." There is no evidence of possible bias in the report.

The report also appears to be final, as it contains a series of narratives with the last narrative indicating that a "final conference" was held with Fernandez and setting forth the investigator's conclusions and recommendations. ECF No. 133-4. In addition, the investigator's conclusions and recommendations appear to have been adopted when an Assistant District Director with the DOL Wage and Hour Division sent a letter to Fernandez dated September, 14, 2011, referencing the investigation and imposing a civil monetary fine of $3,600 based on the regulatory violations found in the investigation. ECF No. 182-1. Moreover, Fernandez paid

the back wages recommended in the DOL report and the civil monetary fine based on the violations found in the report.  ECF No. 49-4.

It is true that a formal hearing was not held and that the results of the report apparently were discussed only with Fernandez.  In addition, the report apparently was not disclosed to all of the parties and was obtained only through a FOIA request submitted by Fernandez after the commencement of this litigation.  ECF No. 50, at 1-2.  Moreover, the report refers to numerous exhibits that are not attached to the report in the form that was released pursuant to the FOIA request. ECF No. 133-4.  However, Fernandez knew the results of the report from the final interview, and Plaintiffs must have been aware of at least some of the findings of the report since they were paid back wages in accordance with the investigator's conclusions and recommendations.

The Court rejects Plaintiffs' argument that the report is biased because Plaintiffs were not able to rebut Fernandez' statements during the investigation. While this allegation affects the question of whether the report could be characterized as "quasi-judiciary" for the purposes of collateral estoppel, it does not impact whether the report itself is trustworthy.  In addition, Plaintiffs were interviewed in the course of the investigation.  Although the investigator found against Plaintiffs on most of their complaints, that does not indicate that the report is untrustworthy.

The Court finds that the report falls within the hearsay exception set forth in Evidence Rule 803(8) and will consider the report admissible for purposes of summary judgment.   However, the Court will disregard internal hearsay statements in the report, such as statements that the investigator attributed to workers at the Fernandez ranch other than Plaintiffs.  In addition, the report is not admissible for its legal conclusions.  *See Sullivan*, 623 F.3d at 777.  Rather, the report may only be considered for its factual findings and conclusions under Rule 803(8)(A)(iii).

### 2.  *Collateral estoppel*

Defendant Fernandez asserts that collateral estoppel bars Plaintiffs' claims that they should have been paid at a rate other than the range sheepherding rate, because the DOL investigator found no violation for failing to pay the proper rate. However, Fernandez admitted in his reply brief that collateral estoppel does not bar Plaintiffs' claims.  ECF No. 180, at 4.  For collateral estoppel to apply, the issue must have been adjudicated in an earlier proceeding.  *E.g., Christensen v. Grant Cnty. Hosp. Dist. No. 1*, 152 Wn. 2d 299, 307-08 (2004).  Fernandez acknowledges that the DOL did not act in an adjudicatory capacity in investigating and issuing its report.

After recognizing that collateral estoppel does not bar Plaintiffs' claims, Fernandez instead argues in his reply brief that "a mixture of equitable estoppel

and accord and satisfaction" actually operates to prohibit Plaintiffs' claims.  ECF No. 180, at 5.  However, a party may not raise new legal issues for the first time in its reply brief.  *See, e.g.*, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999)).  In addition, accord and satisfaction is an affirmative defense that must be raised in the pleadings.  *See* Fed. R. Civ. P. 8.  Fernandez did not plead accord and satisfaction as a defense in his answer, and the Court previously denied Fernandez' motion to amend the scheduling order to permit an amended answer.  ECF No. 198.  Therefore, Fernandez' request for summary judgment under an estoppel theory or accord and satisfaction theory is denied.

### B. FLSA & Washington State wage law claims against Western Range

Western Range moves for summary judgment on Plaintiffs' claims brought under the Fair Labor Standards Act, 26 U.S.C. § 206(a), and Washington State wage law, RCW 49.52.050(2), on the basis that Western Range was not a joint employer of Plaintiffs.  Conversely, Plaintiffs request that the Court find that Western Range was a joint employer of Plaintiffs under the FLSA, that the work Plaintiffs performed was not "range production of livestock" and thus not exempt from the FLSA's minimum wage provisions, and that Plaintiffs were engaged in commerce for the purpose of the FLSA.

Western Range does not contest that Plaintiffs were employed in commerce for the purposes of the FLSA.  Whether Plaintiffs were employed in the "range

production of livestock" is contingent on the type of work they were asked to perform while on the Fernandez ranch and whether those work assignments constituted a breach of Plaintiffs' employment contracts. The Court will analyze that issue later in the Order in connection with Plaintiffs' claim for breach of contract. *See infra* Part C.2. The only remaining FLSA issue before the Court is whether Western Range was a joint employer of Plaintiffs.

The employer-employee relationship is broadly defined under the FLSA. *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997). "Employ" is defined under the FLSA as including "to suffer or permit work." 29 U.S.C. § 203(g). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Ninth Circuit has noted that the definition of "employer" under the FLSA "is to be given an expansive interpretation in order to effectuate the [Act's] broad remedial purposes." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 539 (1985) (citing *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754 (9th Cir. 1979)).

An employee may have more than one employer under the FLSA. *E.g.*, *Torres-Lopez*, 111 F.3d at 638. The FLSA regulations provide that all joint employers are individually liable for violations of the Act. 29 C.F.R. § 791.2(a).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 14

The Ninth Circuit applies the "economic reality test" to determine whether a joint employment relationship exists.  In applying the economic realities test, the court must consider "all those factors which are 'relevant to [the] particular situation' in evaluating the 'economic reality' of an alleged joint employment relationship." *Torres-Lopez*, 111 F.3d at 639 (quoting *Bonnette*, 704 F.2d at 1470); *see also Anfinson v. FedEx Ground*, 159 Wn. App. 35, 53-54 (2010) (holding that FLSA "economic realities" test is the proper legal test for determining employer status under Washington State wage law).  Whether an entity is a "joint employer" under the FLSA is a question of law.  *Id.* at 638.

The Ninth Circuit has identified different relevant factors to apply under the "economic realities" test depending on the particular employment relationship evaluated in each case.  *See Torres-Lopez*, 111 F.3d at 639-40; *Bonnette*, 704 F.2d at 1470; *Real*, 603 F.2d at 754.  Western Range urges the Court to focus on the factors evaluated in *Torres-Lopez v. May*, 111 F.3d 633, but Plaintiffs contend that the factors most relevant to this case are set forth in *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465.

In *Torres-Lopez*, the Ninth Circuit analyzed whether a grower of cucumbers who utilized workers supplied by a farm labor contractor was a joint employer of those workers under the Migrant and Seasonal Agricultural Worker Protection Act (AWPA).  The district court relied on a set of non-exhaustive regulatory factors in

finding that the grower was not a joint employer of the farmworkers.  *Id.* at 640.

The *Torres-Lopez* court found that the district court erred by not also considering

the following non-regulatory factors gleaned from several FLSA cases:

> (1)  whether the work was a specialty job on the production line;
>
> (2)  whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;
>
> (3)  whether the premises and equipment of the employer are used for work;
>
> (4)  whether the employees had a business organization that could or did shift as a unit from one worksite to another;
>
> (5)  whether the work was piecework and not work that required initiative, judgment or foresight;
>
> (6)  whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;
>
> (7)  whether there was permanence in the working relationship; and
>
> (8)  whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 640-41 (internal quotations and citations omitted).

In applying the identified factors to the case, the *Torres-Lopez* court first

concluded that the district court overlooked facts that provided some support for

finding joint employer status under the AWPA regulatory factors.  *Id.* at 642-43.

The court then explained that a finding of joint employer status was even more

appropriate when viewing the nonregulatory factors, because the farmworkers'

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 16

1    task of picking cucumbers was analogous to a specialty job on the production line;

2    the contracts between the grower and the labor contractor were standard and

3    involved little negotiation; the grower leased the land where the cucumbers were

4    picked, and had considerable investment in equipment and materials for the

5    harvest; the farmworkers did not shift as a unit from one worksite to another; the

6    job of picking cucumbers is piecework; the farmworkers worked at a piece-rate

7    and had no opportunity for profit or loss depending upon their managerial skill;

8    and the farmworkers' service of picking cucumbers was integral to the grower's

9    business. *Id.* at 643-44 (citations omitted).

10           In *Bonnette,* 704 F.2d 1465, decided before *Torres-Lopez*, the Ninth Circuit

11    examined whether state and county welfare agencies were joint employers of

12    "chore workers" who provided in-home domestic services to disabled persons.

13    The court examined four factors as particularly relevant to the situation: "whether

14    the alleged employer (1) had the power to hire and fire the employees, (2)

15    supervised and controlled employee work schedules or conditions of employment,

16    (3) determined the rate and method of payment, and (4) maintained employment

17    records." *Id.* at 1470.

18           Analyzing these factors, the *Bonnette* court found that the welfare agencies

19    were joint employers under the FLSA because the chore workers were ultimately

20    paid by the agencies, the agencies maintained employment records, the agencies

exercised "considerable control" over the structure and conditions of the chore workers' employment even though the recipients of the services were responsible for day-to-day supervision, and the agencies had considerable power in the hiring and firing of chore workers by virtue of controlling their pay. *Id.*

Under the circumstances of this case, *Torres-Lopez*'s analysis would be more appropriately directed at whether the ranch owners, Max and Ann Fernandez, were joint employers of laborers provided to the ranch. That is not the question before the Court. Rather, the Court must determine whether Western Range, the entity that provided the laborers, is a joint employer. This particular situation is more analogous to *Bonnette* than *Torres-Lopez*, and thus the Court will apply the *Bonnette* factors to its analysis of this case. *See Bonnette*, 704 F.2d at 1470; *see also Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675-76 (1st Cir. 1998) (finding that the *Bonnette* factors provided the best framework for determining whether an agency that provided temporary workers to other entities was a joint employer of the workers under the FLSA). However, the Court ultimately must consider all factors relevant to the situation. *E.g.*, *Torres-Lopez*, 111 F.3d at 639.

### 1. The power to hire and fire

Western Range generally characterizes its role as being mere "facilitators" of Plaintiffs' employment with Western Range's member ranches, including the Fernandez Ranch. Western Range contends 1) that they did not have the power to

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 18

1    hire the Plaintiffs, and 2) that they had only a limited ability to fire the Plaintiffs to

2    the extent necessary to comply with Western Range's obligations under the H-2A

3    program.  However, the record establishes that Western Range played a substantial

4    role in initiating Plaintiffs' employment as H-2A sheepherders and possessed the

5    exclusive authority to fire Plaintiffs.

6         The undisputed facts establish that Western Range plays an integral role in

7    initiating H-2A sheepherders' employment with its member ranches.  Western

8    Range retains "recruitment coordinators" in Chile and Peru to recruit potential H-

9    2A sheepherders.  ECF No. 146, at 69, 124-25.  These recruitment coordinators

10   work for Western Range alone and have no connection with any of Western

11   Range's individual member ranches.  ECF No. 146, at 76-77.  Plaintiffs in this case

12   were recruited by Western Range's recruitment coordinator in Chile.  ECF No.

13   146, at 69-70.

14        When Western Range recruits a sheepherder, the recruitment coordinator

15   provides the sheepherder with a standard "Pre-Employment Notice of Rights and

16   Obligations" that the sheepherder must sign before they may be transported to their

17   work site in the United States.  The form is prepared by Western Range and was

18   provided to each of the Plaintiffs in this case.  The Pre-Employment Notice

19   generally describes the necessary qualifications for the job, the nature of the work

20   that the sheepherder will perform, the wage rate that they will be paid, the

transportation that will be provided to and from the sheepherder's home country,

and the tools, housing, food, and insurance benefits that will be provided.  The Pre-

Employment Notice additionally informs the sheepherder that they are guaranteed

"3/4 time employment"; that they are subject to transfer among member ranches;

that the sheepherder is to contact Western Range if a member ranch no longer has

need of them, at which time they will be transferred to another ranch; and that the

sheepherder shall contact Western Range immediately if the worker has "any

problems" or becomes unemployed.  ECF No. 146, at 71-72, 79, 117-18.[2]

Once the sheepherder has signed the Pre-Employment Notice, Western

Range obtains the H-2A visa necessary for the sheepherder to come to the United

States, assigns the sheepherder to a member ranch within the United States, and

arranges and pays for the sheepherder's transportation from their country of origin

---

[2]  Western Range points out that the Pre-Employment Notice explicitly states that

the sheepherder "[is] NOT employed by Western Range Association but by a

MEMBER of Western Range Association."  ECF No. 146, at 117.  The existence

of this disclaimer has little bearing on the economic reality of the alleged joint

employer relationship.  *See Real*, 603 F.2d at 755 ("Economic realities, not

contractual labels, determine the employment status for the remedial purposes of

the FLSA.").

to the member ranch.  ECF No. 146, at 46, 83-85, 136-38.[3]  Western Range

identifies itself as the sheepherder's joint employer in applying for the H-2A visa.

ECF No. 146, at 83-85.  Western Range's identification as a joint employer is

legally necessary, as only an employer of a prospective H-2A worker may petition

for issuance of the H-2A visa.  *See* 20 C.F.R. § 655.130-.131.

Once the sheepherder arrives at the member ranch in the United States, the

sheepherder and the member ranch are required to sign a Sheepherder Employment

Agreement.  The Agreement allows Western Range to terminate the employment

of a worker who commits a willful breach of contract.  Moreover, the undisputed

evidence establishes that the individual member ranches cannot terminate a

sheepherder's employment with Western Range and may only refer the

sheepherder to Western Range for reassignment to another ranch, which comports

with Western Range's status as a joint employer under the H-2A program and its

concomitant status as joint guarantor of the sheepherders' employment.  ECF No.

146 at 45, 90,101-02, and 189.  When Western Range terminates a sheepherder, it

---

[3]  While Western Range pays the upfront costs for transportation of the

sheepherder to the United States, the member ranch eventually reimburses Western

Range for these costs.  ECF No. 162, at 29-31.

offers the sheepherder prepaid return transportation to their home country.  ECF No. 146, at 45.

Western Range acknowledges that it may terminate sheepherders, but that it does so only in "very limited" circumstances and has not exercised its right to terminate sheepherders "in recent memory."  ECF No. 161, at 11.  Whether Western Range actually does terminate sheepherders is not particularly dispositive to the economic reality inquiry; the question is whether Western Range has the *power* to fire sheepherders.  *See Bonnette*, 704 F.2d at 1470.  Western Range admits that it does possess the power to terminate the sheepherders' employment.  ECF No. 161, at 10-11.  The fact that Western Range has the power to fire its sheepherders demonstrates that the sheepherders are economically dependent upon Western Range, even if Western Range rarely wields this power.

As evidence that it does not hire and fire the sheepherders, Western Range points to a statement in the Department of Labor's narrative report that "[Western Range] and the [Department of Labor] are responsible for setting up the employment conditions by receiving and employing the H-2A workers and once they are assigned to a rancher the rancher is then responsible for the (sic) hiring and firing the Workers."  ECF No. 133, at 29.  The Court attributes little weight to this portion of the Department of Labor's narrative report as it is contradicted by other evidence in the record.

1    Similarly, Western Range's assertion that it does not "hire" the H-2A

2    workers carries little weight, given that Western Range holds itself out as the

3    Plaintiffs' employer to the Department of Homeland Security when applying for

4    the H-2A visas.  The H-2A workers' employment with Western Range's member

5    ranches would not be legally possible were it not for Western Range's involvement

6    in the process of initiating the employment process.  In addition, Western Range

7    sets all key terms of the Plaintiffs' employment through the Pre-Employment

8    Notice that workers are required to sign before being transported to the member

9    ranch in the United States.

10    Western Range acts as the gatekeeper of H-2A workers' employment and as

11    such cannot credibly argue that they have no role in the "hiring" of said workers.

12    The record conclusively establishes that Western Range has the power to fire the

13    H-2A workers, and the workers cannot be fired without Western Range's approval.

14    ECF No. 146 at 45, 101-02.  Thus, the Court finds that this factor weighs heavily

15    in support of finding that Western Range is a joint employer under the FLSA.

16        *2.  Supervision and control of conditions of employment*

17    Plaintiffs admit that Defendant Max Fernandez supervised and managed

18    Plaintiffs' work once they were placed on the Fernandez ranch.  Fernandez told

19    Plaintiffs what kind of work to do, set Plaintiffs' work schedule, provided

20    Plaintiffs' housing arrangements, and paid Plaintiffs for their work.  Western

Range did not supervise or control Plaintiffs' day-to-day activities while they were at the Fernandez ranch.  At most, Plaintiffs saw a representative from Western Range only once during their employment on the Fernandez ranch.  ECF No. 133, at 8-9, 15-18, 22-24.

However, the fact that Western Range did not supervise Plaintiffs' day-to-day activities does not preclude a finding of joint employer status.  *See Bonnette*, 704 F.2d at 1470 (although in-home care recipients were responsible for the day-to-day supervision of chore workers provided by state agencies, the agencies nonetheless exercised "considerable control over the structure and conditions of employment"); *accord Baystate*, 163 F.3d at 676.  Plaintiffs have established that Western Range exercised considerable control over the terms and conditions of their employment with Western Range's member ranches, including the Fernandez ranch.

The Pre-Employment Notice that Western Range's sheepherders are required to sign before being transported from their country of origin outlines the general terms and conditions of the workers' employment with the member ranches.  ECF No. 146, at 71-72, 79, 117-18.  Once the workers arrive in the United States, Western Range requires that the sheepherder and the member ranch enter into a "Sheepherder Employment Agreement."  While Western Range is not nominally a party to this agreement, the individual member ranch is identified

expressly as a member of the Western Range Association.  Western Range

provides the standard form agreement and does not allow the member ranches or

workers to deviate from its terms.  The Agreement sets the terms of employment,

the employee's duties, compensation, and other conditions of the sheepherder's

employment with the member ranch.  ECF No. 146, at 86-88, 91, 189.

In addition, Western Range has the power to assign sheepherders to its

member ranches and to transfer sheepherders between ranches.  The member

ranches cannot transfer sheepherders without Western Range's involvement and

consent, and a worker who refuses a transfer may be dismissed by Western Range.

Western Range encourages its member ranches to seek the transfer of a

sheepherder to another member ranch as a means of resolving problems in the

sheepherder's employment.  ECF No. 146, at 143, 189.

Plaintiffs Castro and Martinez were in fact transferred by Western Range

from one member ranch to another at various times during their H-2A

employment.  ECF No. 146, at 210-17, 219-21.  Such transfers from ranch to ranch

indicate that although Western Range did not supervise Plaintiffs in their day-to-

day activities on the ranch, it had a great deal of control over the general conditions

of Plaintiffs' employment and the power to intervene if problems arose between

Plaintiffs and a member ranch.

1    Finally, Western Range encourages its sheepherders to contact the

2    Association if problems arise in the course of their employment with a specific

3    member ranch, and Western Range maintains records of sheepherder complaints.

4    ECF No. 146, at 67-68, 117.  Western Range has the power to suspend or terminate

5    the membership of a rancher who violates the conditions of their sheepherders'

6    employment or otherwise mistreats their sheepherders.  ECF No. 146, at 44, 63-66,

7    100-01, 226-27.  Western Range represents that "the threat of suspension or

8    termination by [Western Range] is an effective means of securing compliance" by

9    its member ranches, because individual ranches would have a very difficult time

10   obtaining H-2A workers on their own.  ECF No. 146, at 8.  Western Range also

11   serves as a joint guarantor of the employment contract between the member

12   ranches and sheepherders.  ECF No. 146, at 8, 45.

13   Thus, Western Range exercised considerable control over Plaintiffs'

14   conditions of employment even though they did not supervise Plaintiffs' day-to-

15   day activities on the Fernandez ranch.  Western Range provided the employment

16   contracts that set the terms and conditions of Plaintiffs' employment and did not

17   permit the ranchers or Plaintiffs to deviate from the terms of the standard contract.

18   Western Range assigned Plaintiffs to their work sites and had the power to transfer

19   them between sites.  Western Range also had the power to intervene if disputes

20   arose in the course of Plaintiffs' employment, including by transferring Plaintiffs

to other sites and disciplining the noncompliant member ranches by suspending or

terminating their membership.  Taken together, these facts establish broad control

over the general conditions of Plaintiffs' employment and support a finding of joint

employer status.

### 3.  Rate and method of employees' pay

Western Range asserts that it does not determine the rate and method of

payment of its sheepherders.  The evidence establishes that Plaintiffs in this case

were paid by Max Fernandez, not Western Range.  ECF No. 133, at 9, 24.  In

addition, the United States Department of Labor sets the wage rates for H-2A

sheepherders through regulations and special variances.  20 C.F.R. § 655.120; ECF

No. 162, at 41-44.

However, as Plaintiffs point out, Western Range has some involvement in

the wages and benefits offered to its sheepherders.  Western Range, as a joint

employer under the H-2A program, is required to provide assurance that the wage

rate is followed.  *See* 20 C.F.R. § 655.135.  Western Range also ensures that its

member ranches do not pay sheepherders less than is allowable under the law.

ECF No. 146, at 91-92.

When a member rancher fails to pay a sheepherder the minimum required

wage rate, Western Range may compel the member rancher to pay the correct rate.

ECF No. 188, at 28-29.  Western Range's executive director, Dennis Richins,

1    testified that Western Range would pay a sheepherder's wages if the member ranch

2    did not pay them, or if a gap in the sheepherder's employment with member

3    ranches meant that the sheepherder was not being paid by a specific member ranch

4    at a given time.  ECF No. 162, at 7, 12, 20-21; ECF No. 188, at 31-32.  Western

5    Range also represented that it would ensure that its sheepherders' wages are paid in

6    the event that a member ranch files for bankruptcy.  ECF No. 162, at 8.

7        Western Range requires the member ranches to provide worker's

8    compensation insurance to the sheepherders assigned to them, as required by the

9    H-2A rules.  ECF No. 146, at 56, 189.  Western Range also provides health and life

10   insurance to its sheepherders pursuant to a group insurance plan.  ECF No. 146, at

11   55-56, 201-08.

12       The Court finds that this factor provides support for finding a joint

13   employment relationship.  The economic reality is that Western Range's

14   sheepherders are economically dependent upon Western Range for payment of

15   their wages in the event that the member ranches do not provide legally required

16   wages, and for the provision of benefits accompanying their employment.

17       *4.  Maintenance of employment records*

18       Western Range maintains files for all of its sheepherders.  These files

19   contain the sheepherders' employment contracts, labor certifications, travel

20   information, and records of the sheepherders' transfers between member ranches.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 28

ECF No. 146, at 123-24.  Western Range also keeps a record of any complaints made by or about a particular sheepherder.  ECF No. 146, at 67-68, 106-07. Therefore, Western Range maintains some employment records, which is relevant to the economic realities test under the circumstances.  This factor also weighs in favor of a joint employment relationship.

### 5.  Other factors

Western Range points out that the member ranches control the day-to-day activities of the sheepherders and that the sheepherders perform the work on the member ranches' premises and also use the member ranches' equipment.  ECF No. 133, at 6-8, 14-17, 22-23.  These factors would support a finding that each member ranch is a joint employer of its sheepherders under *Torres-Lopez.  See* 111 F.3d at 640.  However, that conclusion does not preclude a finding that Western Range, as the entity that provides the sheepherders to the member ranches, is also a joint employer.  *See, e.g.*, *id.* at 641 (noting the "fundamental principle" that a worker "may be employed by more than one entity at the same time").

As the Ninth Circuit stated in *Torres-Lopez*, "[t]he issue is not whether a farmworker is *more* dependent upon the farm labor contractor or the grower," but rather whether "the economic reality of the particular relationship" between the worker and the various entities involved supports joint employer status for each particular entity.  *See id.* (emphasis in original).  Here, the economic reality

1    between the sheepherders and Western Range supports a finding of joint employer

2    status even though the sheepherders may be more dependent on the member

3    ranches in the day-to-day facets of their employment.

4         Plaintiffs urge the Court to consider Western Range's status as a joint

5    employer under the H-2A program as dispositive in determining whether Western

6    Range is a joint employer under the FLSA.  In support of this argument, Plaintiffs

7    rely on the Fifth Circuit's opinion in *Salazar-Calderon v. Presidio Valley Farmers

8    Ass'n*, 765 F.2d 1334 (5th Cir. 1985).  *Salazar* dealt with a similar situation where

9    crop growers in a particular region formed an association, the Presidio Valley

10   Farmers Association ("PVFA"), for the purposes of obtaining foreign agricultural

11   workers under the H-2 visa program.  *Id.* at 1338-39.  The H-2 visa program was

12   the predecessor to the current H-2A program.  Immigration Reform and Contract

13   Act of 1986, Pub. L. No. 99-603, § 301(a), 100 Stat. 3359, 3411.

14        In *Salazar-Calderon*, the PVFA contended that it could not be liable for

15   alleged violations of the Farm Labor Contractor Registration Act ("FLCRA")

16   because it was not a joint employer of the H-2 workers under the Act.  *Id.* at 1346.[4]

17

18   [4] "Joint employment" has the same meaning under the FLCRA and its successor

19   statute, the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"),

20   as under the FLSA.  *Moreau v. Air France*, 356 F.3d 942, 947 n.2 (9th Cir. 2004).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 30

1    The Fifth Circuit rejected this assertion, stating that "the PVFA cannot seriously

2    challenge [the district court's finding of joint employer status] since it repeatedly

3    represented itself to be the plaintiffs' employer when applying to the INS for the

4    H-2 visas." *Id.* The court noted that the PVFA's employer status was necessary to

5    obtain the H-2 workers' visas since the visas could be granted "only on the petition

6    of the 'importing employer.'" *Id.* The court further highlighted the PVFA's role

7    in the H-2 workers' employment, which it described as such:

> [T]he PVFA [was formed] to create a pool of temporarily legalized
> labor which its members could share. It was [the] PVFA, not the
> individual growers, who determined what terms of employment would
> be offered in the H-2 visa petitions. It was [the] PVFA, not the
> individual growers, that was listed as the plaintiffs' employer on the
> INSA visa petitions. . . . [A]lthough the majority of the plaintiffs were
> employed by a single grower, over the course of the harvest many
> worked for more than one PVFA member because the growers shared
> the workers among themselves as their employment needs varied.

13    *Id.* at 1344.

14    *Salazar-Calderon* is persuasive as the facts of the PVFA's relationship with

15    the H-2 workers are similar to Western Range's relationship with the Plaintiff

16    sheepherders in this case. However, Western Range's mere status as a joint

17    employer under the H-2A program is not determinative of an entity's joint

18    employment relationship under the FLSA's economic reality test. Rather, Western

19    Range's status as a joint employer under the H-2A program, and all of the

assurances and obligations it is required to undertake under the program, influences the Court's analysis of the economic realities as set forth above.

After consideration of all relevant factors, the Court concludes that Western Range was a "joint employer" of the Plaintiffs under both the FLSA and Washington State wage law.

## C. Breach of contract against Western Range and Fernandez

Plaintiffs assert a cause of action against both Western Range and Fernandez for breach of Plaintiffs' employment contracts. ECF No. 1, at 14-15. Western Range moves for summary judgment on Plaintiffs' breach of contract claim on the basis that it was not a party to the contracts. Plaintiffs move for summary judgment on the breach of contract claim against both Western Range and Fernandez.

### 1. *Whether Western Range was a party to the contract*

Western Range contends that it was not a party to Plaintiffs' employment contracts and thus may not be held liable on this basis. The Sheepherder Employment Agreements identify Fernandez and Plaintiffs as parties to the contract, and the contract is signed by those parties alone. Fernandez is identified as "a member of [Western Range]" in the contract, but Western Range is not expressly identified as a party to the contract nor is the contract signed by someone from Western Range. ECF No. 146, at 189-90. Plaintiffs recognize that Western

1    Range is not named as a party to the contract, but assert that the Association was a

2    party nonetheless.  In addition, Plaintiffs assert that Western Range is bound to the

3    contract according to its role as joint employer under the H-2A regulations.

4        The burden of proving the existence of a contract lies with the party

5    asserting its existence.  *Johnson v. Nasi*, 50 Wn. 2d 87, 91 (1957).  The formation

6    of a valid contract requires mutual assent.  *Yakima Cnty. (West Valley) Fire Prot.*

7    *Dist. No. 12 v. City of Yakima*, 122 Wn. 2d 371, 388-89 (1993).  "Mutual assent

8    generally takes the form of an offer and an acceptance."  *Id.* (quoting *Pac. Cascade*

9    *Corp. v. Nimmer*, 25 Wn. App. 552, 555-56 (1980)).

10       Plaintiffs point out that Western Range drafted the standard employment

11   contract and requires all of its sheepherders and member ranches to use the

12   contract; that Western Range does not permit any deviations from the standard

13   contract; and that the member ranch is identified as a member of Western Range in

14   the contract.  ECF No. 146, at 86, 91, 189.  Plaintiffs also point to various

15   provisions in the contract that would make little sense if Western Range were not a

16   party to the contract:  that the member ranch is required to indemnify and hold

17   harmless Western Range for wage claims made by sheepherders under the

18   contract; that if a member ranch fails to pay a sheepherder, the sheepherder must

19   notify Western Range within a specified period of time or forfeit any claim against

20   Western Range; and that Western Range determines the sheepherders' initial job

1    assignment and may transfer sheepherders between the member ranches.  ECF No.

2    146, at 87-88, 189.

3           The Court concludes that Plaintiffs have set forth sufficient evidence

4    creating a genuine issue of material fact as to whether Western Range manifested

5    intent to be bound by the terms of the Sheepherder Agreement, notwithstanding

6    that it was not nominally a party to the contract.

7           In addition, the Court concludes that Western Range is party to a work

8    contract with each Plaintiff sheepherder as a matter of law pursuant to the H-2A

9    program regulations.  Western Range chose to apply for temporary employment

10   certification as a joint employer under the H-2A program.  *See* 20 C.F.R. §

11   655.131.  The H-2A regulations draw no distinction between joint employers of

12   workers under the program.  20 C.F.R. § 655.103(b).  Under the H-2A program, an

13   employer is required to provide assurance that it will "comply with all applicable

14   Federal, State and local laws and regulations," including the FLSA.  20 C.F.R. §

15   655.135.

16          Moreover, the H-2A program regulations explicitly provide that when there

17   is not a separate written work contract between an employer and worker, the

18   temporary employment certification and job order form a work contract.  20 C.F.R.

19   § 655.122(q) states in relevant part:

20          The employer must provide to an H-2A worker . . . a copy of the work
            contract between the employer and the worker . . . . At a minimum,

> the work contract must contain all of the provisions required by this section.  In the absence of a separate, written work contract entered into between the employer and the worker, the required terms of the job order and the certified Application for Temporary Employment Certification will be the work contract.

20 C.F.R. § 655.103(b) defines a "work contract" as "[a]ll the material terms and conditions of employment relating to wages, hours, working conditions, and other benefits, including those required by 8 U.S.C. 1188, 29 CFR part 501, or this subpart."  *See also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1233 n.5 (11th Cir. 2002) ("[T]he [H-2A] clearance orders ultimately become the work contract between the employers and farmworkers."); *Martinez-Bautista v. D & S Produce*, 447 F. Supp. 2d 954, 960-62 (E.D. Ark. 2006).

Even in the absence of a separate, written work contract, Western Range was party to an employment contract with Plaintiffs incorporating all required provisions of the H-2A regulations.

### 2.  *Whether Defendants breached Plaintiffs' employment contracts*

Plaintiffs assert that employment conditions mandated under the H-2A program are incorporated into an H-2A worker's employment contract as a matter of law.  Defendants do not dispute this point.  Under the H-2A regulations, an H-2A employee's "work contract" must contain all of the provisions required by the regulations and in the event that there is not an explicit work contract, the required terms of the job order and the Application for Temporary Employment

1    Certification are the work contract.  20 C.F.R. § 655.122(q).  The regulations

2    define the "work contract" as "all the material terms and conditions of employment

3    relating to wages, hours, working conditions, and other benefits, required by the

4    applicable regulations . . . ."  20 C.F.R. § 655.103(b).

5         Plaintiffs assert that Defendants breached the employment contract by

6    failing to pay them under federal minimum wage or the adverse effect wage rate.

7    *See* 20 C.F.R. § 655.120, .135.  Plaintiffs' theory is that they were paid under the

8    H-2A program's "special provision" for range sheepherders and were treated as

9    exempt from the FLSA under the "range production of livestock" exemption, 29

10   U.S.C. § 213(a)(6)(E), but were in fact not principally employed as sheepherders.

11        The FLSA provides an exemption from its minimum wage and maximum

12   hour requirements for employees who are "principally engaged in the range

13   production of livestock."  29 U.S.C. § 213(a)(6)(E).  This exemption has been

14   construed through regulations and case law to apply when the employee's primary

15   duty is in the range production of livestock.  *Hodgson v. Elk Garden Corp.*, 482

16   F.2d 529, 530-31 (4th Cir. 1973); 29 C.F.R. § 780.329 (a).  In addition, the

17   employee's work must require "a constant attendance on a standby basis, such as

18   herding and similar activities where the computation of hours worked would be

19   extremely difficult."  *Hodgson*, 482 F.2d at 533; 29 C.F.R. § 780.329 (a).  FLSA

20   exemptions are to be narrowly construed against employers and the employer

1  claiming an exemption bears the burden of demonstrating its applicability.  *E.g.*,

2  *Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir. 2011) (internal citations

3  omitted).

4         Plaintiffs generally assert that, during their employment with the Fernandez

5  ranch, they spent little time engaged in sheepherding on the range and instead

6  spent most of their time performing other tasks at ranch headquarters, such as

7  feeding sheep, cows, dogs, and horses; chopping firewood; assisting with the

8  lambing; maintaining machinery; constructing and repairing fences; and general

9  clean up and maintenance.

10         Fernandez disputes these contentions and asserts that Plaintiffs were

11  principally engaged in the raising of sheep, either out on the range or back at the

12  ranch area during periods when the sheep cannot be on the range.  Fernandez

13  denies that Plaintiffs performed many tasks wholly unrelated to the sheep and

14  contends that he had other workers hired for those jobs.  ECF No. 137, 172.

15  Fernandez additionally notes that the DOL report concluded that any work the

16  sheepherders did besides caring for the sheep was "de minimis."  ECF No. 133-4,

17  at 8.  However, the Court considers the DOL investigator's finding on this point of

18  little value, as the DOL's investigator's finding was predicated primarily on

19  inadmissible hearsay, including statements from sheepherders other than the

20  Plaintiffs.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 37

1    Plaintiffs admit that there are disputed facts regarding the nature of

2    Plaintiffs' work at the Fernandez ranch.  Plaintiffs nonetheless assert that they are

3    entitled to summary judgment on their breach of contract claim because, even

4    under Fernandez' facts, the sheepherders could not have spent more than fifty

5    percent of their time herding sheep "on the range."

6    Fernandez testified that the sheep generally were taken out to the range in

7    May and were brought back to the ranch area in winter where food could be

8    provided to them.  From approximately December to May the sheep were at the

9    main ranch, not on the range.  ECF No. 138, at 12, 17, 20-21.  However, Fernandez

10   specified that during a portion of the time that the sheep were at the main ranch,

11   approximately March and April of each year, Plaintiffs would assist with the

12   lambing.  ECF No. 138, at 17-18.  In addition, for a portion of the time that the

13   sheep were away from the main ranch they were kept in a fenced-in grazing area

14   rather than on the open range.  ECF No. 168, at 26.  Fernandez further testified that

15   only one sheepherder at a time would be with the sheep when they were out on the

16   range, although the other H-2A worker would be used as a "tender" who would

17   take food and supplies out to the sheepherder on the range.  ECF No. 146, at 235.

18   Plaintiffs rely on an overly technical reading of the regulations pertaining to

19   the exemption in arguing that the foregoing facts establish that they are entitled to

20   judgment as a matter of law.  The regulations are concerned with whether the

1    "primary duty" of the employee is "to take care of the animals actively or to stand

2    by in readiness for that purpose."   29 C.F.R. § 780.325(a).  This includes not only

3    "herding" sheep, but also other activities such as "handling, transporting, feeding,

4    watering, caring for, branding, tagging, protecting, or otherwise assisting in the

5    raising of livestock." 29 CFR § 780.327.  Also included are such "immediately

6    incidental duties" as "inspecting and repairing fences, wells, and windmills." *Id.*

7         The regulations state that "[i]n the ordinary case," more than fifty percent of

8    the employee's time should be dedicated to this purpose.  *Id.*  However, the

9    regulations also specify that all the facts in the particular case must be considered.

10   *Id.*  The regulations provide that even an employee whose primary duty is to

11   actively care for the animals or stand by ready for that purpose may "perform some

12   activities not directly related to the range production of livestock, such as putting

13   up hay or constructing dams or digging irrigation ditches."  29 C.F.R. §

14   780.325(b); *see also* 29 C.F.R. § 780.327 (identifying "such work as terracing,

15   reseeding, haying, and constructing dams, wells, and irrigation ditches" as work

16   that does not fit within "production of livestock" for purposes of the exemption).

17        Plaintiffs focus heavily on statements in the regulations that qualified work

18   must take place "away from headquarters" and that the exemption is "not intended

19   to apply to feed lots or to any area where the stock involved would be near

20   headquarters." 29 C.F.R. § 780.329(b), (c).  However, the purpose of these

subsections is to emphasize that the work should involve "herding and similar activities where the computation of hours worked would be extremely difficult." *Hodgson*, 482 F.2d at 533; 29 C.F.R. § 780.329 (a).  Whether Plaintiffs' primary duties were range production of livestock, where the computation of hours worked would be extremely difficult, is a question for the jury given the disputed issues of material fact in this case.  Therefore Plaintiffs' motion for summary judgment is denied as to whether Defendants breached Plaintiffs' employment contracts and as to whether Plaintiffs' employment fit within the FLSA's "range production of livestock " exemption.

### D. Quantum meruit against Western Range and Fernandez

In their complaint, Plaintiffs identify a cause of action against both Western Range and Fernandez for quantum meruit.  Plaintiffs assert that they were required to perform general ranch work when they were not working as sheepherders and that Defendants knew, or should have known, that Plaintiffs were entitled to greater wages for the general ranch work.  Plaintiffs request compensation in the form of the difference between the sheepherder wages that they were paid for the work and the adverse effect wage rate which they allegedly should have been paid.  ECF No. 1, at 15-16.  Defendants Western Range and Fernandez each moved for summary judgment on Plaintiffs' quantum meruit claim.

1    Quantum meruit is not an independent cause of action, but rather "is the

2    method for recovering the reasonable value of services provided under a contract

3    implied in fact." *Young v. Young*, 164 Wn. 2d 477, 485 (2008).  A contract

4    implied in fact exists where "(1) the defendant requests work, (2) the plaintiff

5    expects payment for the work, and (3) the defendant knows or should know the

6    plaintiff expects payment for the work."  *Id.* at 486 (discussing *Johnson v. Nasi*, 50

7    Wn. 2d 87, 91 (1957)).

8      Plaintiffs cannot recover in quantum meruit because they had valid

9    employment contracts with the Defendants.  It is undisputed that Fernandez was

10    party to an express contract with Plaintiffs.  Western Range was also party to a

11    work contract under the H-2A program as a matter of law.  "A party to a valid

12    express contract is bound by the provisions of that contract, and may not . . . bring

13    an action on an implied contract relating to the matter." *MacDonald v. Hayner*, 43

14    Wn. App. 81, 85-86 (1986) (quoting *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.

15    2d 591, 604 (1943).

16    Plaintiffs' citation to *D'Amato v. Lillie*, is unpersuasive.   401 F. Appx. 291

17    (9th Cir. 2008) (unpublished opinion).  In *D'Amato* the Ninth Circuit applied

18    Washington law and held that plaintiffs could recover under a theory of unjust

19    enrichment despite the existence of a valid, express contract governing the matter.

20    *Id.* at 293-94.  However, the Washington Supreme Court has explained that

"'unjust enrichment' is founded on notions of justice and equity whereas 'quantum meruit' is founded in the law of contracts, a legally significant distinction." *Young v. Young*, 164 Wn. 2d 477, 486 (2008).

Plaintiffs have not produced evidence demonstrating that the parties had a mutual intention to contract for additional work beyond the provisions of Plaintiffs' employment contracts.  There is nothing to suggest that Plaintiffs expected to be paid for additional work and that Fernandez or Western Range knew, or should have known, that Plaintiffs expected payment for additional work.  *See id.* at 485-86.  Plaintiffs only have shown that they contracted for sheepherding work but were allegedly required to do a great deal of work other than sheepherding, which only supports a breach of the existing agreements rather than an entirely distinct agreement mutually agreed upon by the parties.

In addition, Western Range could not be sued under a theory of quantum meruit even in the absence of an express employment contract because it was Fernandez, not Western Range, who requested work from Plaintiffs.  Plaintiffs each testified in their deposition that Fernandez is the one who told them what kind of work to do at the ranch.  ECF No. 133, at 8, 16-17, 22-23.  To the extent that Western Range requested any work from Plaintiffs, it was only as sheepherders at the Association's member ranches.  ECF No. 146, at 144.  Therefore, summary

judgment is appropriate in favor of the Defendants on Plaintiffs' claims for recovery in quantum meruit.

**E. TVPRA Claims against Fernandez**

The forced labor provision of the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464, as amended by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044, makes it illegal to "knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

The statute further defines the term "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the

law was not designed, in order to exert pressure on another person to cause that

person to take some action or refrain from taking some action." 18 U.S.C. §

1589(c)(1). The term "serious harm" is defined as "any harm, whether physical or

nonphysical, including psychological, financial, or reputational harm, that is

sufficiently serious, under all the surrounding circumstances, to compel a

reasonable person of the same background and in the same circumstances to

perform or to continue performing labor or services in order to avoid incurring that

harm." 18 U.S.C. § 1589(c)(2).

Under 18 U.S.C. § 1592(a), it is also illegal to "knowingly destroy[],

conceal[], remove[], confiscate[], or possess[] any actual or purported passport or

other immigration document, or any other actual or purported government

identification document, of another person" in the course of committing a peonage,

slavery, involuntary servitude, forced labor, or trafficking violation, or with intent

to commit such violation. Although the TVPRA is a criminal statute, 18 U.S.C. §

1595(a) confers a private right of action for any victim of a trafficking violation.

Plaintiffs assert claims against Defendant Fernandez under § 1589(a) and §

1592(a) of the TVPRA. Fernandez moves for summary judgment contending that

he cannot be held liable for violations of the TVPRA under the circumstances of

this case.

1    In support of their TVPRA claim, Plaintiffs have introduced evidence that

2    Fernandez confiscated Plaintiff Ruiz' and Plaintiff Castro's passports when they

3    arrived at the Fernandez ranch, and kept those documents despite Plaintiffs'

4    requests for their return.  Castro stated in a declaration that Fernandez took away

5    his passport when he arrived on the ranch in March of 2008 and did not return it

6    until Castro transferred from the Fernandez ranch in October 2008.  ECF No. 171,

7    at 2.  Ruiz stated in a declaration that Fernandez took his passport from him when

8    he arrived on the Fernandez Ranch in late August of 2007 and did not return it

9    until the fall of 2009.  ECF No. 173, at 1-2.

10    All three Plaintiffs testified at their depositions that Fernandez made

11    repeated threats that he would call the police or immigration authorities on them.

12    ECF No. 168, at 39, 53, 67.  Plaintiffs characterized these threats as constant and

13    continuous, and believed that Fernandez made these threats to intimidate them.

14    ECF No. 168, at 67; ECF No. 171, at 2; ECF No. 173, at 3; ECF No. 174, at 3-4.

15    Plaintiff Martinez further stated in a declaration that after Castro left the ranch,

16    Fernandez told Martinez that the FBI was hunting down Castro for leaving.  ECF

17    No. 174, at 6.  Fernandez also instructed Plaintiffs not to speak with neighbors or

18    anyone they might encounter near the property.  ECF No. 168, at 63; ECF No. 171,

19    at 2.

20

Plaintiffs additionally point to several incidents occurring after they left the ranch as evidence that Fernandez acted with coercive intent while Plaintiffs were in his employ.  Several days after Plaintiffs sent Mr. Fernandez a letter demanding unpaid wages, Fernandez filed a criminal complaint against Plaintiff Ruiz accusing him of theft.  Ruiz stated in a declaration that the charge was baseless.  ECF No. 173, at 4.  Later, after the DOL found that Fernandez owed Castro and Ruiz unpaid wages, both Castro and Ruiz received anonymous letters threatening that immigration authorities would be waiting for them when they went to the DOL office to pick up their checks.  Plaintiffs believe these letters were sent by Fernandez since he knew about the wage checks waiting for them at the DOL office.  ECF No. 171, at 4; ECF No. 173, at 3-4.

A jury could reasonably find that these events occurred as described by Plaintiffs, and could infer from these events that Fernandez intended to coerce Plaintiffs while they were employed at his ranch.  Moreover, federal courts have held that withholding immigration documents and threatening deportation can serve as the basis for a TVPRA violation.  *See United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 111, 115 (D.D.C. 2012); *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1143-47 (C.D. Cal. 2011); *Ramos-Madrigal v. Mendiola Forestry Serv., LLC*, 799 F. Supp. 2d 958, 960 (W.D. Ark. 2011).

1    In support of his request for summary judgment, Fernandez contends that he

2    did not violate the TVPRA by withholding Ruiz' and Castro's passport s because

3    he eventually gave the passports back.  However, as stated above, Plaintiffs have

4    introduced evidence that they repeatedly asked to have their passports returned,

5    and that despite those requests the passports were not returned for some time,

6    including for approximately two years in the case of Plaintiff Ruiz.

7        Fernandez also contends that his threats to report the Plaintiffs were justified

8    because if Plaintiffs left the Fernandez ranch without being assigned to another

9    member ranch by Western Range, then they would be in violation of their

10   temporary work visas.  However, as stated above, Plaintiffs testified that these

11   threats were made almost daily and were apparently made in relation to Plaintiffs'

12   general willingness to do specific work on the ranch rather any sort of expressed

13   intent to leave the ranch without obtaining a transfer.  Although immigration laws

14   must be respected, they are not intended to help employers retain employees

15   through threats of deportation.  *See Calimlim*, 538 F.3d at 713.  A jury could infer

16   that Fernandez' reference to the immigration laws were directed "to an end

17   different from those envisioned by the law and were thus an abuse of the legal

18   process."  *See id.*

19       Fernandez also points out that both Plaintiffs Castro and Ruiz met their

20   future wives while employed at the Fernandez ranch.  Castro had his girlfriend and

later wife visit him approximately twice per month while he was out on the range. ECF No. 138, at 65-67.  Ruiz met his wife while at the Fernandez ranch, although they met over the phone and she never came to visit the Fernandez ranch.  ECF No. 138, at 83.  However, to the extent that Fernandez is contending that Plaintiffs were free to have visitors and interact with persons outside the ranch, Plaintiffs have introduced contradictory evidence that Fernandez instructed Plaintiffs not to speak with neighbors or anyone they might encounter near the property.  ECF No. 168, at 63; ECF No. 171, at 2.

Ruiz finally points to Plaintiffs' ability to transfer between member ranches as evidence that they were not forced into labor at the Fernandez ranch.  Martinez originally began his H2-A employment with other member ranches and was transferred to the Fernandez ranch.  ECF No. 137, at 4-5; ECF No. 168, at 2-3. Plaintiff Castro began his H-2A employment with Fernandez, and was then transferred to another Western Range member ranch before transferring back to the Fernandez ranch.  ECF No. 137, at 3-4; ECF No. 168, at 2.  Plaintiff Ruiz spent his entire term of employment on Fernandez' ranch, but stated in his deposition testimony that he knew Western Range could transfer H-2A workers to different ranches.  ECF No. 138, at 86.

For their part, Plaintiffs assert that they were not free to transfer to another ranch at their own request.  Plaintiff Ruiz testified that he was not aware that he

could call Western Range and ask to be transferred to a different ranch. ECF No. 168, at 68. Plaintiff Castro stated in a declaration that while he was told that Western Range could transfer sheepherders, he did not know how to communicate with Western Range and did not know if Western Range would grant a sheepherder's request for a transfer or what the consequences of a transfer request might be. ECF No. 171, at 6. Martinez stated in a declaration that his previous transfers had been at the request of the member ranches and that he did not believe that he could request a transfer on his own. ECF No. 174, at 2.

Plaintiffs further argue that Plaintiffs' employment agreement did not state that workers had a "right" to transfer to another ranch, but rather only that Western Range and the member ranch could transfer a worker to another member ranch. According to the terms of the agreement, if the worker objected to a transfer Western Range would "consider" their concerns, but refusal to transfer "may subject the worker to dismissal." ECF No. 146, at 190.

The parties' dispute over whether Plaintiffs could in fact request a transfer on their own, and whether they knew that they could request a transfer, demonstrates that there exist genuine issues of material fact regarding Plaintiffs' TVPRA claim. In viewing the facts and all reasonable inferences in the light most favorable to Plaintiffs, as the non-moving party, the Court finds that there is

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 49

sufficient evidence that a reasonable jury could find that Fernandez violated the TVPRA.

Accordingly, **IT IS HEREBY ORDERED**:

1. Western Range Association's motion for summary judgment, **ECF No. 130**, is **GRANTED IN PART** and **DENIED IN PART**.  Western Range's motion is granted as to Plaintiffs' quantum meruit claim and denied in all other respects.

2. Fernandez' motion for summary judgment, **ECF No. 135**, is **GRANTED IN PART** and **DENIED IN PART**.  Fernandez' motion is granted as to Plaintiffs' quantum meruit claim and denied in all other respects.

3. Plaintiffs' motion for partial summary judgment, **ECF No. 140**, is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' motion is granted insofar as Western Range was a joint employer of Plaintiffs under the FLSA, Plaintiffs were engaged in commerce within the meaning of the FLSA, and Western Range was a party to a work contract

/ / /

/ / /

/ / /

/ / /

with Plaintiffs incorporating all necessary terms of the H-2A regulations as a matter of law.  Plaintiffs' motion is denied in all other respects.

**IT IS SO ORDERED**.

The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** this 7th  day of June 2013.


    *s/ Rosanna Malouf Peterson*
    ROSANNA MALOUF PETERSON
    Chief United States District Court Judge